[No. B192743. Second Dist., Div. Eight. Jan. 7, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
ARTHUR GEORGE CRABTREE, Defendant and Appellant.

**COUNSEL**

David H. Goodwin, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Kristofer Jorstad and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**COOPER, P. J.**—Arthur George Crabtree appeals from the judgment entered following a jury trial that resulted in his conviction of felony attempted lewd act upon a child under age 14 (Pen. Code, §§ 288, subd. (a), 664; count 1 ("Hope")).[1] Felony attempted sending harmful matter to minor (§§ 288.2, subd. (b), 664; counts 2, 4, 8); misdemeanor attempted child molesting (§§ 647.6, subd. (a), 664; counts 3 ("Becky"), 5 ("Hailey"), 6 ("Jenny"), 7 ("Sammy")); misdemeanor child molesting (§ 647.6, subd. (a); count 9 (N.N.)); and felony lewd act upon a child age 14 or 15 by perpetrator at least 10 years older (§ 288, subd. (c)(1); count 10 (N.N.)). Appellant was sentenced to prison for five years and eight months.

Appellant contends his convictions for attempted child molesting in counts 3 ("Becky") and 6 ("Jenny") must be reversed, because they were not prosecuted within the one-year statute of limitations. He contends the trial court abused its discretion in denying his request for cocounsel status and violated his right to present a defense (U.S. Const., 14th Amend.) by not allowing the unspecified out-of-court statements of C.C. (H.H.'s sister), which were admissible under the state of mind exception to the hearsay rule. He further contends the trial court committed prejudicial error by admitting hearsay evidence of a bubble bath sales receipt and evidence of prior bad acts by him.

Appellant also contends the prosecutor committed prejudicial misconduct and challenges the sufficiency of the evidence to support his convictions in counts 1 ("Hope") and 10 (N.N.). He attacks his sentence on count 1 on the dual grounds that consecutive sentences and imposition of the upper term violated *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856] (*Cunningham*).

By letter, we invited the parties to submit supplemental briefs on these issues: (1) Did the trial court commit unauthorized sentencing error by failing first to impose the appropriate sentence on count 9 before pronouncing "[c]ount 9 will be stayed pursuant to [section] 654"?; (2) Did the court further err by failing to impose any $20 court security fees (§ 1465.8, subd. (a)(1)?; (3) If so, was the trial court required to impose this fee as to each conviction, including one for which punishment was stayed under section 654 (*People v. Crittle* (2007) 154 Cal.App.4th 368, 370–371 [64 Cal.Rptr.3d 605] (*Crittle*))?; (4) What is the total amount of the court security fees the trial court is required to impose?; and (5) Is the upper term on count 1 justified based on the aggravating circumstance of "multiple victims" although "multiple victims" has been deleted as an *enumerated* circumstance

---

[1] All further section references are to the Penal Code unless otherwise indicated.

from rule 4.421 of the California Rules of Court? (See Cal. Rules of Court, rule 4.408(a); *People v. Calhoun* (2007) 40 Cal.4th 398, 400 [53 Cal.Rptr.3d 539, 150 P.3d 220]; but see *People v. Sandoval* (2007) 41 Cal.4th 825, 842, fn. 5 [62 Cal.Rptr.3d 588, 161 P.3d 1146].) We have received their responses.

Based on our review of the record and applicable law, we reverse appellant's sentence (1) on counts 3 and 6, (2) with respect to the trial court's failure to impose an appropriate sentence on count 9 and then stay execution of that sentence, and (3) the court's failure to impose a $20 court security fee on each of appellant's eight convictions. In all other respects, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

We view the evidence in the light most favorable to the People and presume the existence of every fact the trier could reasonably deduce from the evidence that supports the judgment. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].) This evidence established: Appellant, an attorney who sometimes acted as a "pro tem judge" and was once a City of Glendale police officer, preyed on children for his own sexual gratification. He sexually molested his minor sister-in-law, committed a lewd act on a 15-year-old girl, and sexually targeted female minors in Internet chat rooms.

In 1991, appellant went camping with B.P., his then 12-year-old sister-in-law who had been adopted from Korea, and other members of her family. While B.P. was sleeping in the camper, appellant, who lay near her, fondled her breasts under her shirt for several minutes and rubbed her genital area under her panties for about five minutes. B.P. noticed bleeding in her vaginal area the next day. Although she reported the incident to a sheriff's deputy at school the next day, she was forced to act as if nothing had happened, because her mother said she would side with appellant if the matter went to court.

In 1995, about 4:00 or 4:30 a.m., H.H., then 15 years old, was at bus stop in Glendale, waiting for one of two buses needed to take her to Pasadena High School, when uniformed appellant approached in a Glendale police vehicle. He asked what she was doing out so early and entered her identification information into his vehicle computer. Subsequently, appellant dropped by the same stop three to four times a week and spoke to H.H. on each visit for about 30 minutes to an hour. A few months later, he arrived at H.H.'s house and asked her for a date. Appellant, who had a gun and extra rounds on his police belt, hugged H.H. close in a way she felt "wasn't just a normal hug," and he tried to kiss her before leaving.

In 2003, N.N. (counts 9, 10) encountered appellant, the uncle of a church friend, for the first time in an online chat room under N.N.'s screen name "Actress NMN." Appellant on one occasion sent her a picture of himself. During a chat, N.N. told appellant she was 15 years old. When he asked N.N. to masturbate, she complied.

From 2002 until his arrest in 2005, appellant was the subject of six Internet sexual child predator sting operations. Three were conducted by the Federal Bureau of Investigation (FBI) Sexual Assault Felony Enforcement Team, an FBI state and local task force that investigates crimes against children. The FBI special agent would log on to the Internet pretending to be a child between ages 12 and 14 and wait in chat rooms to be approached by individuals seeking to entice or coerce minors into sexual relationships. Additional sting operations were conducted by the Los Angeles Police Department, the San Jose Police Department, and the California Department of Justice.

On March 26, 2002, FBI Agent Timothy Alon, whose screen name was "BECKY13NLA," went online posing as 13-year-old "Becky" (count 3), who lived in Los Angeles. Appellant, whose screen name was "MARKH661," contacted "Becky" and stated he was a lawyer in his "30's" and that he was "from Valencia, by Magic Mountain." When "Becky" said she was "13," he responded, "Hi, perfect age." In response to his inquiry, "Becky" replied she was in the seventh grade. He also asked "how big" ["Becky"] was "on top" and whether she had "French kissed" before.

On March 28, 2002, appellant contacted "Becky" and asked her for a date, suggesting they meet the following week. He wanted to know whether she had a one- or two-piece swimsuit and said he wanted to rub lotion on her. He added they could go to a spa and she should definitely bring her bikini.

During his contact with "Becky" on April 1, 2002, appellant again asked about her grade in school. After giving "Becky" his "800" phone number, appellant told her to throw away the number after she called him.

On April 11, 2002, appellant again contacted "Becky." After she related that she had written down his number in her diary, appellant became concerned and stated she should "be careful about that." He then suggested "Becky" skip school and meet him. He asked if she had seen pornographic movies.

On April 18, 2002, appellant told "Becky" he wanted to snuggle and kiss her while watching television and related he might get "horny" while watching a pornographic movie.

Appellant gave "Becky" his phone number again on April 22, 2002. He told her he would like to put sunscreen lotion on her and "Becky" should have her bikini ready. He concluded by telling her he was getting really attached to her although they had not met yet and he would like to give "Becky" a big hug and a kiss. He added he will make her "a great kisser."

When he contacted "Becky" on April 30, 2002, appellant discussed in detail how he wanted to engage in oral sex with "Becky." On May 14, 2002, appellant asked "Becky" if she had a "cute butt," discussed oral sex again, and once more asked "Becky" how big she was "up top." He instructed "Becky" how to call his "800" number without her parents finding out. He told her he could get into trouble "[b]ecause of age difference . . . ."

On May 22, 2002, "Becky" and appellant exchanged photographs. The photograph of "Becky" was in fact that of a Los Angeles County sheriff's deputy when she was about 12 to 13 years old. Appellant instructed "Becky" how to delete his picture file and empty to the computer's trash can. He discussed his desire to take a bubble bath in a spa with "Becky," and how he would orally copulate her. He asked if "Becky" would be okay with kissing and "even French kissing."

During June 2002, appellant had various online contacts with "Becky." On June 5, he asked if she looked "pretty good in a bikini" and whether she had a "web cam." He requested she switch from AOL to Yahoo!, which had "web cam" availability. After sending her a video of his penis, appellant asked "Becky" if she would really touch it. He also asked about her pubic hair. On June 17, 2002, appellant related he was a "lawyer." On June 18, "Becky" told appellant she had left a telephone message. After listening to the message, which was left by a female decoy, appellant responded that she had "the sweetest voice." On June 26, appellant once more asked "Becky" her size "up top" and then inquired about her nipples and bikini tan lines. He asked about the types of condoms he should bring and wanted to know what she wore to sleep. He also asked whether she had had her first period yet and whether she became "horny" when her menstrual cycle was about to begin.

On August 2, 2002, appellant told "Becky" his concern about being caught if he met her in person. He asked if she wanted to watch a pornographic movie online together and if she ever thought about a possible "threesome."

Appellant's last sexually related contact with "Becky" was on September 2, 2002. He asked for more pictures of her and related his desire to take pictures of "Becky" in her swimsuit and nude pictures in sexual poses. He asked if she had a two-piece bikini. He also spoke about getting "Becky" a vibrator to play with and discussed in detail how he was going to orally

copulate her. During their last contact on October 17, 2002, appellant and "Becky" talked about Hawaii.

The second FBI sting operation also involved Alon, whose screen name at the time was "JennySF13," and who posed as 13-year-old "Jenny" (count 6) living in San Fernando Valley. On May 5, 2003, "Jenny" was contacted online by appellant who told her he liked "young girls" and asked her age. "Jenny" said she was 13 and in seventh grade. Appellant gave her his "800" number and discussed using a spa together and French kissing. He also asked how big "Jenny" was "up top." He told her he was near Magic Mountain. On June 23, 2003, appellant contacted "Jenny" again and talked about going together to the movies. He encouraged her to call him at his "800" number. His last contact with "Jenny" was on November 11, 2003, at which time he related that seeing her in a bikini would "make him nuts."

The final FBI sting operation involved agent Adrienne Mitchelle, whose screen name was "Sammy13CA," posing as a 13-year-old girl named "Sammy" (count 7) living in Santa Monica. On August 27, 2003, appellant contacted "Sammy" online for the first time. They chatted on 13 separate occasions. "Sammy" told appellant she was "kind of shy" and that she was "five-two with brown hair and blue eyes" and going into the eighth grade. Appellant said he lived by Magic Mountain. They conversed about the type of food "Sammy" liked, romantic walks along the beach, cuddling in the spa, and whether she was a good French kisser. Appellant asked "how big [she] was] up top" and whether she preferred "one-piece or two-piece swimsuits." When asked about a girlfriend, appellant stated he had a platonic relationship with someone. He also related he owned a business and he was a lawyer in his thirties.

In September 2003, appellant contacted "Sammy" twice. On September 2, while in the "I Love Older Men" chat room, he asked her what grade she was in and the age of the guys she preferred. She again said she was in the eighth grade. On September 29, appellant again asked about her grade in and asked whether she had a "webcam" and if she were "okay with the age difference." He spoke about meeting her after school and asked where he should pick her up.

Appellant once more asked what grade "Sammy" was in on November 11, 2003. She said the eighth grade. He also asked whether she liked one- or two-piece swimsuits and for her picture. He related his marital status and stated his wife was "never here." On January 30, 2004, appellant asked "Sammy" whether she was okay with his age, which was in the "upper 30's," and was serious about meeting him. He again asked about the age of the guys she preferred and for a picture during their chat on February 18, 2004.

On March 3, 2004, appellant became sexually explicit during an instant message and related his desire to "lick[]" "Sammy" and "suck[]" her top "so bad" and spoke about spending a weekend together and his "body slamming up against [hers] as [they] do it." He asked where she wanted him to "explode" if he "were to explode." He told her he also wanted to speak with her on the phone. "Sammy" told appellant again she was 13 years old and in the eighth grade.

On June 2, 2004, "Sammy" repeated that she was in the eighth grade and related she was not experienced with sex.

While in a chat room known as "School Yard Hotties" on August 27, 2004, "Sammy" was again contacted by appellant. While discussing what they would do if they met, he asked if she was the "romantic type." She responded, "I don't know. I am only 13." He also asked if she was a good kisser and whom she lived with at home. When "Sammy" said she had to leave, appellant replied, "Okay. I love you, Sammy. God, I wish you were here. E-mail me also. Okay." He then wrote, "Smiley face with 'X, O, X, O, X, O.' "

On August 31, 2004, during an instant message, appellant discussed with "Sammy" what they would do when they met. He asked if she could handle a boyfriend of his age, adding, "Um, not meaning like can you handle me inside you or anything." He mentioned rubbing suntan lotion on her and asked "Sammy" if she would rub it on him too. He related his desire to be "boyfriend girlfriend" with "Sammy" and explained he no longer had sex with his wife because he had caught her cheating on him.

Appellant related he dreamt about being together with "Sammy" in a spa while holding hands and kissing. He asked if there were things she would not want to do with a boyfriend, such as having "sex or having him lick you." He then said, "Hmmm, sexually? [W]ell, nothing more than you are willing to do, but if you were ready, I think after we got to know each other, some serious foreplay, like me licking/fingering you would be fun." When asked if having sex would hurt, he responded, "Hmmm, first time it's uncomfortable because your hymen is stretched/broken, but it's incredible feel. There's nothing like sex in the world." He then asked "Sammy," whether she would "honestly want me to slide my cock inside you and make you cum?" He added, "Okay. So I can either pull out, cum on your tummy, or use a condom. You okay with that?"

Expressing concern about their relationship, he asked "Sammy" to "promise not to tell anyone[,] not even your best friend." He told her, "I can promise no one will find out from me, and I can't promise it won't be

uncomfortable [the] first time if we go full sex, but I can either lick you or make you cum. That way will be gentle."

Appellant asked "Sammy" if she could meet him Friday and whether she was serious about "meeting in real life." "Sammy" said she had school Friday but suggested they meet the next week.

Los Angeles Police Department Detectives Robert Cervantes and Robert McCarty participated in an Internet investigation posing as "Hailey" (count 5), a 13-year-old girl, whose screen name was "SK8RHailey1990." On May 28, 2004, appellant contacted "Hailey" through e-mail. "Hailey" related she was 13 years old, five feet two inches tall, 95 pounds, and had blond hair and blue eyes. Appellant stated he was a lawyer in his "upper 30's," and he lived in Santa Clarita near Magic Mountain. He asked "Hailey" for a picture, said he wanted to meet her, and spoke about French kissing and two-piece swimsuits.

During June 2004, appellant had four online contacts with "Hailey." On June 4, 2004, appellant asked to meet "Hailey" and if she was "a good kisser." On June 7, 2004, appellant talked about "French kissing while [he] let [his] fingers slowly wander around down there." He also talked about taking a bath with her. On June 14, 2004, appellant said he wanted to check out her tan line and talked about "doing X-rated stuff and actually watching the acts—doing the acts together and maybe watching them on TV." She responded that she was not experienced. On June 15, appellant asked "Hailey" to call him at a telephone number later confirmed to be registered to appellant at his Santa Clarita address. In addition to their chats, appellant and "Hailey" also exchanged e-mails discussing tan lines, rubbing lotion, and a possible meeting after school.

The duties of San Jose Police Officer Adam Tover included engaging in Internet chats to seek out individuals interested in underage children. His screen name was "BrittanySanJose." On November 24, 2004, while in a chat room known as "Daughters Bikini Too Small," "Brittany" was contacted by appellant through instant messaging. They spoke about going to Hawaii and sharing the same bed together. They discussed "Brittany's" appearance, and appellant expressed his desire to put sunscreen on her.

Appellant then turned the chat into one of an explicitly sexual nature. He asked if "Brittany" was experienced sexually and offered to teach her "how to make love." He asked if he could "lick you down there" or "between your legs" and "[d]o you have any hair down there?" He asked "how big [she was] up top." When appellant asked for a picture, "Brittany," who already had told him she was 13 years old and a foster child, sent him a picture of another officer who was 13 when the picture was taken.

He sent "Brittany" three pictures. One of himself wearing a plaid shirt and a second picture through instant messaging. After asking if he should show her "something nasty," he sent a picture of his penis. He asked "Brittany" to show herself naked if she had a Webcam. He gave her his "800" number so that it would not show up on the telephone bill and asked her to call him. He expressed continual concern about the pictures he had sent and asked whether "Brittany" had erased the files.

Appellant told "Brittany" he was "*just thinking of us* [F]*rench kissing*" and asked whether she had already had her first period. He told her "I would definitely like to start rubbing your pussy area while we [F]rench kiss and make you very wet down there," and added, "[M]aybe to make it wetter, I would like to lick down there and put my tongue inside you . . . ." He again mentioned "teaching" her and related his desire to "suck [her] nipples." He also told "Brittany," "Especially once I am inside you and your pussy muscles will be clenching onto me, trying to milk cum out of me, you will feel so good." He offered to buy "Brittany" a plane ticket to fly to Hawaii and related his desire to volunteer to be her foster parent.

During December 2004, appellant made three additional online contacts with "Brittany." On December 7, when asked what grade she was in, "Brittany" responded the ninth grade. Appellant again discussed his concern about the pictures he had sent her. On December 8, appellant expressed his desire to teach "Brittany" "oral" and asked, "[S]o you wouldn't mind me licking, fingering you?" He also asked, "[W]ould you be okay with my age doing it with you?"

When asked whether he had had sex with a girl before, appellant responded he had had sex with his then 14-year-old sister-in-law. He repeated his desire to be her foster dad and explained that way they could make out in front of the fireplace and take romantic nude baths together. When appellant again asked about her grade, "Brittany" said ninth grade. She also told him she had just turned 13 years old. The two then discussed fingering or using a dildo and "Brittany's" menstrual cycle.

On December 12, appellant told "Brittany" that he was thinking about flying to San Jose to meet her and about a "way that wouldn't raise suspicion to get you down here with me." "Brittany" suggested January would be better, because she was being transferred to a new group home. Appellant told "Brittany" he loved her.

On January 14, 2005, their last contact, appellant told "Brittany" he had just had eye surgery and was going to go rest.[2]

Jeffrey MacKanin, a California Department of Justice special agent supervisor who oversaw a federal and state task force investigating child exploitation crimes, posed online as an underage girl named "Hope" (count 1) and whose screen name was "RunawayGirl14." On December 7, 2004, appellant contacted "Hope" online. "Hope" told him she was a 13-year-old runaway living in Sacramento. When she related she was "four-ten, 90 pounds with blue eyes," he responded, "Damn, you sound nice." He said he was "in his upper 30's."

Appellant sent an e-mail picture of himself in a checkered shirt and he asked for a picture of her. Special Agent Tera (Faris) MacKey handwrote the greeting card containing a picture of a female detective when she was an early teenager and sent the card through the mail to appellant from "Hope." Appellant originally identified himself as "Mark" to "Hope," but then asked her to send the picture to a mailbox address in Santa Clarita addressed to "Arthur." He also sent "Hope" a picture of a 13-year-old girl with her nipples showing through her clothes.

After appellant gave "Hope" his "800" number, MacKey, posing as "Hope," contacted him at this number about five minutes later. A Google search of that number led to appellant's law practice Web site.

Appellant had two separate online contacts with "Hope" on December 14, 2004. During the first, appellant stated his real name was "Arthur" and explained he used "Mark" while chatting online. "Hope" related she was staying with a man named "Jeff" and they would "get intimate" a "couple of times a week." Appellant asked detailed questions about their sexual relationship. He then told "Hope" he was looking into various kinds of transportation for her to meet with him and expressed concern about age restrictions for those who were underage using Greyhound buses. During their second chat, appellant and "Hope" discussed possibly going to Hawaii together. Appellant sent "Hope" several pictures of individuals engaging in sex acts.

On December 15, 2004, appellant told "Hope" about his relationship with his wife and talked about "Hope" staying in a motel during her visit. He discussed oral sex and spoke of his purchase of a thong bikini for "Hope." He mentioned they could spend time with appellant's son, and "Hope" was not to worry about the ticket cost because appellant had money. He repeatedly told "Hope" he loved her.

---

[2] On November 24 and again on December 9, 2004, Detective Michelle Colombo, acting as "Brittany," made pretext calls to appellant. Both calls were recorded and transcribed.

In the latter part of December, appellant made three more online contacts with "Hope." On December 16, he told "Hope" of his dream about having sex with her "doggy style" and related his sister-in-law, whom he had molested previously, was adopted from Korea. On December 21, he told "Hope" they should meet on January 3, 2005, and he would send her money to buy a Greyhound bus ticket. While discussing what they would do when they met and got a room, he said they would "cuddle" under a blanket and engage in sex. On December 22, appellant told "Hope" that he was going to buy the bus ticket and stated they would take a bubble bath together. They again discussed a possible Hawaii trip together and talked about making arrangements for someone to care for appellant's son while appellant was traveling.

On January 5, 2005, appellant had two separate online chats with "Hope." During the first, appellant told "Hope" they would have to be careful not to get her pregnant and asked about the alcoholic drinks she liked. During the second chat, the two discussed sexual topics. In a pretext telephone call made by MacKey as "Hope" that same day, "Hope" and appellant agreed to meet on January 19, 2005. The next day, appellant sent "Hope" several pictures, including one of his penis. Before he sent them, he made "Hope" promise to delete the pictures.

On January 14, 2005, appellant contacted "Hope" online and related he had bought a bus ticket from Sacramento to Newhall for January 19, 2005, at 6:30 a.m., and he would include $20 for food with the ticket. He gave "Hope" a telephone number to call upon her arrival. He told her he was leaving the chat for the post office. Upon his return, he stated, "It's off in the mail."

On January 17, 2005, appellant sent "Hope" an e-mail with instructions to get off at the North Hollywood Greyhound station and where to meet him. The next day, he sent an e-mail giving "Hope" a description of what he would be wearing.

On January 18, 2005, MacKanin received a package from appellant containing a Greyhound bus ticket and a $20 bill. Appellant was arrested the next day by the FBI. FBI Special Agent Douglas Cook noticed appellant's Lexus parked at the Greyhound bus station on 7th Street in Los Angeles and observed appellant as he approached at least three different female teenagers.

During the subsequent search of appellant's vehicle that day, FBI Special Agent Michael Osborne recovered various items from its trunk, including a laptop, a massaging device, a bottle of Viagra, condoms, and bubble bath soap. A receipt found with the bubble bath reflected the soap was purchased on January 19, 2005, at 1:41 p.m. Osborne also retrieved a two-piece

swimsuit along with a purchase receipt from the trunk. The receipt for $107.09 reflected the bikini was bought on January 18, 2005, at 2:29 p.m.

Appellant, who testified in his own defense, denied ever molesting his sister-in-law B.P. He testified that during his initial online contact with N.N., he believed she was in her 30's. He explained that before the preliminary hearing, he went to church simply to apologize to N.N. about making her feel uncomfortable during the chats and admitted the court later issued a restraining order requiring him to stay away from her.

As for the other online "girls," appellant testified he knew they were cops and that he engaged in chats with them in order to get back at law enforcement, because he was forced to leave his police job due to an unfair internal investigation. He explained that basically, he learned about law enforcement Internet sting operations during his tenure as a judge pro tem.

With regard to "Hope" ("RunawayGirl14"), appellant testified he knew he was talking with a police officer, and he initially had no intention of showing up at the meeting location. Rather, he intentionally changed the location several times "to have them run in circles." He later decided to show up for the meeting, because he thought she might be a real minor and he wanted to clear his conscience.

Appellant explained the bikini, which was in "Hope's" favorite color, purple, was a "consolation prize" for the minor and that he had obtained the Viagra, condoms, and vibrator found in his trunk for a romantic weekend with his wife, Susie. Appellant's sister testified that he had a habit of giving gifts, such as a basket of bubble bath soaps.

Appellant admitted he had approached H.H. several times. He also admitted going to H.H.'s home at which time her mother explained H.H.'s boyfriend now took her to school. Appellant denied going to H.H.'s house after her mother left and asking H.H. for a date. In rebuttal, C.H., H.H.'s mother, testified she was working for the Los Angeles Police Department when H.H. was 15 years old, and at some point C.H. reported appellant's actions toward her daughter to the department.

D.B. testified appellant was her next-door neighbor when she was about 15 years old and usually, when her parents were gone, appellant would pop over the wall and talk to her while she was at the pool tanning or swimming, which made her uncomfortable. Also, she felt uneasy both when he called and when he showed up at the door and talked with her.

J.H., the stepdaughter of appellant's sister, testified when she was in seventh grade, appellant took her to the mall and allowed her to drive his car.

He made her feel uncomfortable when he reached over to fasten her seatbelt. She did not recall him putting his hand on her thigh before this incident.

## DISCUSSION

### 1. *One-year Statute of Limitations Bars Counts 3 and 6*

On January 16, 2006, an information was filed charging appellant with misdemeanor attempted child molesting of "Becky" (count 3) and "Jenny" (count 6), among others. Appellant was alleged to have attempted to molest "Becky," who was "under the age of eighteen years" "[o]n or between March 26, 2002 and October 17, 2002." He was alleged to have attempted to molest "Jenny," who was "under the age of eighteen years" "[o]n or between May 5, 2003 and November 13, 2003." Appellant contends his convictions for these counts must be reversed because they were not prosecuted within the one-year statute of limitations.

■ Appellant's contention is well taken. Section 647.6, subdivision (a)(1) provides: "Every person who annoys or molests any child under 18 years of age shall be punished by a fine not exceeding five thousand dollars ($5,000), by imprisonment in a county jail not exceeding one year, or by both the fine and imprisonment." As a general rule, "prosecution for an offense not punishable by death or imprisonment in the state prison [i.e., a misdemeanor] shall be commenced within one year after commission of the offense." (§ 802, subd. (a).) An express exception exists for the "[p]rosecution for a misdemeanor violation of Section 647.6 or former Section 647a committed with or upon a minor under the age of 14 years[, which] shall be commenced within three years after commission of the offense." (§ 802, subd. (b).)

■ In this case, the determination whether a one-year or a three-year statute of limitations applies is dependent upon how the prosecution elected to charge the offense in the first instance. The information in this case always alleged attempted child molestation of "Becky" (count 3) and "Jenny" (count 6); the completed offense was never charged. Consequently, the one-year statute of limitations applies. Although there is not a case directly on point, this conclusion seems compelled by how some related sentencing issues have been resolved. For example, in *In re McSherry* (2007) 157 Cal.App.4th 324 [68 Cal.Rptr.3d 518], it was held that the three-year statute of limitations applied to a prosecution for attempted "felony" annoyance or molestation of a child under age 18 years with prior lewd act conviction (§§ 801, 647.6, subd. (c)(2).) It is clear from the reading of the case however, that the three-year statute applied because the defendant had a prior lewd act conviction, raising this misdemeanor to a felony in the first instance. Based on similar reasoning, if an offense is an alternative felony/misdemeanor (wobbler) initially charged as a felony, the three-year statute of limitations for

felonies applies, without regard to the ultimate reduction to a misdemeanor after the filing of the complaint. (*People v. Superior Court (Ongley)* (1987) 195 Cal.App.3d 165, 169 [240 Cal.Rptr. 487]; *People v. Sillas* (2002) 100 Cal.App.4th Supp. 1 [123 Cal.Rptr.2d 340]; see also *People v. Soni* (2005) 134 Cal.App.4th 1510 [36 Cal.Rptr.3d 864].) If, however, the initial charge is a felony, but the defendant is convicted of a necessarily included misdemeanor, the one-year limitation period for misdemeanors applies. (*People v. Mincey* (1992) 2 Cal.4th 408 [6 Cal.Rptr.2d 822, 827 P.2d 388].) In this case, counts 3 and 6 were originally filed as misdemeanors. For this reason, the convictions on count 3 and count 6 must be reversed.

## 2. *Denial of Cocounsel Status Not Abuse of Discretion*

Appellant contends the trial court abused its discretion in denying his request for cocounsel status. During a pretrial conference, appellant's attorney requested that because "appellant is a licensed attorney in the State of California," he should be appointed cocounsel. Trial counsel argued: "In preparation of this case, I received numerous boxes of an internal affairs investigation that was just overwhelming. He [appellant] has done the preparation of that part."

In denying the motion, the trial court confirmed that appellant "will be sitting next to [his] counsel the whole time and be able to discuss everything with [him]. Correct?" At a subsequent hearing, appellant's attorney renewed his motion for cocounsel status. He argued no delay would result if the motion was granted, and appellant was better prepared to cross-examine some of the "1108's" witnesses.

The trial court denied the renewed motion. The court noted that often in criminal cases, the investigating officer does not "do any of the questioning and sits there with boxes of materials" but the officer advises the prosecutor, who is not "fully prepared and [does not] know all the witnesses," as to "who the witnesses are, and who is next, and what we are going to do," including the "questions that need to be asked." Addressing appellant's attorney, the court stated: "[Y]our client is going to be sitting next to you with this information and be able to assist you with your cross-examination, with your presentation of your evidence, if you are going to present any, and in refuting any of the prosecutor's evidence."

■ "As long as a defendant is represented by counsel at trial, he has no absolute right to participate personally in his own defense. (*People v. Mattson* (1959) 51 Cal.2d 777, 789 [336 P.2d 937].) While the Sixth Amendment guarantees both the right to self-representation and the right to counsel, a defendant who elects representation by counsel does not have a constitutionally protected right to appear as cocounsel. (*People v. Bloom* (1989) 48 Cal.3d

1194, 1218 [259 Cal.Rptr. 669, 774 P.2d 698]; *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1162 [259 Cal.Rptr. 701, 774 P.2d 730].) The court may exercise its discretion and permit a defendant to actively participate in the presentation of his case. But it grants that request on a substantial showing the cause of justice would be served and the 'orderly and expeditious conduct of the court's business' would not be substantially hindered. (*Mattson, supra*, at p. 797.)" (*People v. Pena* (1992) 7 Cal.App.4th 1294, 1301 [9 Cal.Rptr.2d 550].) "The burden is on the defendant to make the requisite showing. A trial court is not required to inquire further into the matter where the defendant has not first offered the 'substantial showing.' [Citations.]" (*Id.* at p. 1302.) "Where . . . a defendant fails to show cocounsel status would serve the interests of justice and would not result in substantial disruption, there is no basis for the exercise of the court's discretion, and the motion is properly denied. [Citation.]" (*Ibid.*)

The trial court here did not abuse its discretion in denying the request that appellant be appointed as cocounsel. Although no significant delay would have resulted, appellant failed to show his cocounsel status was necessary to compensate for some inadequacy of his attorney or how such status would have enhanced his defense. Trial counsel simply stated that appellant had prepared that portion of his defense involving the "internal affairs investigation" and was therefore "far more suited" than trial counsel to cross-examine the witnesses of the 1108's because trial counsel would have to conduct the examinations from appellant's notes, which trial counsel had not read yet.

Counsel did not claim that he would not be able to cross-examine these witnesses effectively. Also, appellant was going to sit at the counsel table and could assist trial counsel during trial.

3. *Exclusion of Statements Did Not Violate Right to Present Defense*

Appellant contends his right to present a defense was violated by exclusion of certain out-of-court statements which were admissible under the state of mind exception to the hearsay rule. We disagree. At trial, appellant's attorney conceded appellant engaged in the online chats and sent the various e-mails. As his principal defense, appellant asserted his conduct was motivated by revenge against law enforcement for his perceived mistreatment during an internal affairs investigation of him and that he did not in fact entertain the requisite child molester state of mind. Rather, his online activities were part of his scheme to get back at law enforcement by playing a "F—k their mind game," in which he would target officers who were on the Internet searching for child molesters and "lead them on a merry chase."

During trial, counsel asked appellant what part of the internal investigation made him angry, and appellant responded: "Essentially only one part, and that

was [H.H.'s] investigation." When asked why that part made him angry, he replied: "Because I reviewed a transcript of an eyewitness who was present."[3] After the court sustained the prosecutor's hearsay objection to the content of that transcript, appellant offered, "[I]t goes to state of mind as to why he . . . was angry." The court ruled that appellant could say that "he disagreed with whatever. He doesn't have to say what they said. That calls for hearsay." We agree. First, the statement of the eyewitness does not qualify for the state of mind exception to the hearsay rule, as the statement has nothing to do with the eyewitness's state of mind. Second, the eyewitness's statement has no relevance to the case. The offer of proof was that the statement of the eyewitness made him angry. The precise content of that statement was not relevant to the work of the jury in this case and properly rejected by the trial judge.[4]

### 4. Admission of Hearsay Bubble Bath Receipt Not Prejudicial

Appellant contends the trial court admitted prejudicial inadmissible hearsay, namely, evidence of a sales receipt found in his vehicle.[5] We conclude admission of this evidence was not prejudicial. During trial, the prosecutor proffered evidence of a sales receipt that reflected, in pertinent part, the bubble bath soap was bought on January 19, 2005, at 1:41 p.m. at Bath and Body Works, a store in the Northridge Fashion Center. Appellant objected that the receipt was inadmissible hearsay, because no custodian of records was called to testify, a prerequisite of the business records exception. The trial court overruled the objection. This was error. "Except as provided by law, hearsay evidence is inadmissible." (Evid. Code, § 1200, subd. (b).) The sales receipt memorialized certain out-of-court statements whose relevance, if any, was grounded in the truth of the matters asserted and, thus, they are hearsay.

---

[3] In response to further questioning, appellant testified that in 1995 an interview was conducted of C.C., an eyewitness and H.H.'s sister, which was taped. Appellant felt C.C. could clear him. He testified that he had tried unsuccessfully "[n]umerous times" to subpoena her for trial.

[4] "The state of mind exception to the hearsay rule is found in Evidence Code section 1250. That section provides: '(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant. [¶] (b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed.' " (People v. Garcia (1986) 178 Cal.App.3d 814, 822, fn. 6 [224 Cal.Rptr. 198].)

[5] Appellant forfeited his federal due process (U.S. Const., 14th Amend.) objection now urged on appeal by not making this objection at trial. (See, e.g., People v. Alvarez (1996) 14 Cal.4th 155, 186 [58 Cal.Rptr.2d 385, 926 P.2d 365]; People v. Fauber (1992) 2 Cal.4th 792, 854 [9 Cal.Rptr.2d 24, 831 P.2d 249].)

Under the commonly known business record exception, "[e]vidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness." (Evid. Code, § 1271.)

The trial court erred in finding evidence of the sales receipt recitals was admissible under the business record exception to the hearsay rule because Agent Osborne was not a "qualified witness" in lieu of the custodian of records of the Bath and Body Works business or some other qualified witness. Respondent, upon whom the burden to establish the exception falls, makes no attempt to spell out his "qualifications"; rather, the thrust of its position is the "identity" of "common, computer-generated sales receipts of the sort commonly handed to customers at check-out points in large retail establishments . . . is such common knowledge that virtually anybody who has ever purchased anything in a store is 'qualified' . . . ." Respondent cites no applicable authority for this novel "common knowledge" presumption for store sales receipts, and we decline to create one.[6]

Although admission of the Bath and Body Works sales receipt evidence was error, this error was not prejudicial. A result more favorable to appellant probably would not have ensued if that evidence had been excluded. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) We also note that no objection was made to Agent Osborne's earlier testimony about the $107.09 sales receipt from Everything But Water, the Swimwear Source, a store on Topanga Canyon Boulevard, for a two-piece bikini at 2:29 p.m. on January 18, 2005, the day before his arrest. This receipt along with the bikini and bubble bath were found during the search of his vehicle's trunk upon his arrest.

---

[6] (Cf. *People v. Maki* (1985) 39 Cal.3d 707, 709, 717 [217 Cal.Rptr. 676, 704 P.2d 743] [in probation revocation context, "documentary hearsay evidence which does not fall within an exception to the hearsay rule may be admitted if . . . sufficient indicia of reliability regarding the proffered material," namely, "identification of defendant's signature on the printed invoice and the fact that it is an invoice of the type relied upon by parties for billing and payment of money" in that "[i]mprinted with a Hertz emblem, the invoice [apparently was a] typical one utilized by Hertz in transacting business, and it contained internal evidence of its place of issue to which had been affixed an identifiable signature by defendant"]; *People v. Dorsey* (1974) 43 Cal.App.3d 953, 960–961 [118 Cal.Rptr. 362] [bank officer, testifying as custodian of records, authenticated records as those maintained by the bank in the regular course of business albeit omitting to testify regarding mode and preparation of bank statements].)

## 5. *Prior Bad Acts Evidence Admissible on Motive and Intent*

Appellant contends the trial court committed reversible error by admitting, under Evidence Code section 1108, evidence of his prior bad acts, which were both irrelevant and prejudicial. No error or abuse of discretion occurred.

Prior to trial, appellant informed the court he objected to evidence from H.H. and L.S.[7] In overruling appellant's objection, the trial court ruled "the probative value outweighed the prejudicial effect" of allowing evidence of appellant's prior bad acts. Although acknowledging some of the matters seemed to be remote, the court explained when viewed all together, they revealed "an ongoing continued conduct and the subsequent conduct after that of the stalking and having a relationship with underage females . . . ."

The prosecutor cross-examined appellant regarding the internal affairs investigation. She mentioned that 17-year-old L.S. stated appellant "French kissed" her, and the prosecutor asked appellant, "[D]id you?" When asked if he had had a dating relationship with L.S., appellant responded in the affirmative but added he was 24 years old at the time and the incident occurred 20 year ago. He also answered that he told the internal affairs investigators L.S. was 18 years old at that time.

Appellant raised for the first time on appeal objections to the testimony of his neighbor's daughter D.B., J.H., Police Officer Jay Frank, and police cadet Isabel Rivas. Appellant has forfeited any claims of error as to D.B., Frank, Rivas, and J.H. by failing to make a timely objection on the grounds urged for the first time on appeal. (See, e.g., *People v. Thomas* (1992) 2 Cal.4th 489, 519–520 [7 Cal.Rptr.2d 199, 828 P.2d 101]; *People v. Morris* (1991) 53 Cal.3d 152, 187–188 [279 Cal.Rptr. 720, 807 P.2d 949].)

Additionally, on the merits, his claims of error as to this evidence as to these witnesses are unsuccessful. The challenged evidence was both highly probative of appellant's motive and intent, which were at issue, and the trial court's determination that admission of such evidence was more probative than prejudicial was not an abuse of discretion.

■ In *People v. Falsetta* (1999) 21 Cal.4th 903, 910, 922 [89 Cal.Rptr.2d 847, 986 P.2d 182], our Supreme Court held admission of evidence regarding a defendant's propensity to commit a sexual offense under Evidence Code section 1108 does not violate the defendant's constitutional right to due process of law. The court explained: "In 1995, the Legislature enacted section

---

[7] On appeal, appellant concedes he is not challenging the evidence as to H.H. or B.P. in this context.

1108 to expand the admissibility of disposition or propensity evidence in sex offense cases. Subdivision (a) of that section provides in pertinent part that 'In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352 [permitting court to exclude evidence on weighing probative value and prejudicial impact].' " (*People v. Falsetta*, at p. 911.)

"By removing the restriction on character evidence in section 1101, section 1108 now 'permit[s] the jury in sex offense . . . cases to consider evidence of prior offenses *for any relevant purpose*' [citation], subject only to the prejudicial effect versus probative value weighing process required by section 352." (*People v. Britt* (2002) 104 Cal.App.4th 500, 505 [128 Cal.Rptr.2d 290], first brackets in original.)

"When an objection to evidence is raised under Evidence Code section 352, the trial court is required to weigh the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption. Unless these dangers 'substantially outweigh' probative value, the objection must be overruled. [Citation.] On appeal, the ruling is reviewed for abuse of discretion. [Citation.]" (*People v. Cudjo* (1993) 6 Cal.4th 585, 609 [25 Cal.Rptr.2d 390, 863 P.2d 635].)

The trial court did not abuse its discretion in determining the probative value of this evidence outweighed any potential prejudice from its admission. "There was no danger of undue consumption of time or of confusion of the issues. The evidence was not of a sort likely to provoke emotional bias against a party or to cause the jury to prejudge the issues upon the basis of extraneous factors. (See *People v. Minifie* (1996) 13 Cal.4th 1055, 1070–1071 [56 Cal.Rptr.2d 133, 920 P.2d 1337] [in the context of Evidence Code section 352, unduly prejudicial evidence is evidence that would evoke an emotional bias against one party]; *People v. Zapien* (1993) 4 Cal.4th 929, 958 [17 Cal.Rptr.2d 122, 846 P.2d 704] ['prejudice' as used in Evidence Code section 352 refers to the harm of prejudging on the basis of extraneous factors].)" (*People v. Jenkins* (2000) 22 Cal.4th 900, 1008 [95 Cal.Rptr.2d 377, 997 P.2d 1044].)

6. *No Prosecutorial Misconduct Shown*

Appellant contends the prosecutor committed prejudicial misconduct when "she presented arguments that were not based on the evidence, she vouched for her own credibility, and she was rude and abusive to appellant while he was on the [witness] stand . . . ." We conclude appellant forfeited some of his misconduct claims and, on the merits, no misconduct by the prosecutor has been shown.

### a. *Governing Legal Principles*

" 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the *federal* Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " [Citations.] Under *state law*, a prosecutor who uses deceptive or reprehensible methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' [Citations.] [¶] 'A defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety.' [Citation.]" *People v. Lopez* (2008) 42 Cal.4th 960, 965–966 [71 Cal.Rptr.3d 253, 175 P.3d 4].)[8]

### b. *Prosecutor Made No Comments on Facts Not in Evidence*

Appellant contends the prosecutor committed misconduct by arguing facts not in evidence by making improper remarks about (1) appellant's relationship with the district attorney's office; (2) his separation from the Glendale Police Department; (3) the bubble bath purchase date; (4) a sexual harassment suit against the City of Glendale and appellant; (5) appellant's dating relationship with L.S.; and (6) appellant not testifying as an expert. On the merits, the misconduct argument is not well taken. While a prosecutor commits misconduct when he or she argues facts not in evidence, the record does not support appellant's claim the prosecutor argued facts outside the evidence presented.

*Relationship with the District Attorney's Office.*

In addressing his knowledge about sex crime investigations, appellant identified certain documents as "[p]olice training manuals." He then testified, "When I was in the D.A.'s Office, they [gave] me . . . ." At this juncture, the prosecutor objected, but appellant finished his sentence by identifying what was given him were "D.A. training manuals." The prosecutor objected that appellant "was never in a D.A.'s Office. He was a liaison officer stationed in the Glendale Office." The court sustained the objection.

---

[8] "A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel. The appellate record, however, rarely shows that the failure to object was the result of counsel's incompetence; generally, such claims are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing where the reasons for defense counsel's actions or omissions can be explored. [Citation.]" (*People v. Lopez, supra,* 42 Cal.4th at p. 966.) Appellant here does not claim his attorney was ineffective in this respect.

The prosecutor subsequently argued to the jury that appellant "tries to say he was part of the D.A.'s office. In reality, he was a liaison officer stationed at the Glendale D.A.'s Office." The prosecutor's remarks were not outside the record and constituted fair comments drawn from appellant's own earlier testimony that he was "assigned as the [Glendale Police] Department's court liaison officer where [he] had a[n] office in the Glendale D.A.'s Office for five years [and] filed thousands of cases there."

*Separation from Glendale Police Department.*

The remarks regarding appellant being "fired" were made in three contexts: First, in describing what alerted him that the persons with whom he was chatting online were police officers, appellant testified the language used in the chats was similar to certain police lingo and he was familiar with such lingo, because "I train it to my trainees." The prosecutor objected and stated appellant "was fired and had no trainees." Second, while examining appellant about the individuals he had spoken with in trying to gain profiling expertise, the prosecutor asked, "[A]nd was this before or after you were fired from [the] Glendale Police Department?" The third instance transpired subsequently when appellant was explaining his anger at the police and testified there existed a document whose effect he thought cleared him. The prosecutor responded, "Again, I will object to speculation as to clearing him. He was fired." Appellant's attorney responded appellant "was never fired." The trial court sustained the objection.

After appellant testified on cross-examination that a Sergeant Lardy at some point gave him information about investigation involving children, the following colloquy transpired without objection: "Q. And was this before or after you were fired from [the] Glendale Police Department? A. I was never fired, ma'am. Q. Before or after you were given an option to leave? A. I was never given an option, ma'am. Q. You were in the middle of a civil service hearing where you were given an offer, and you said you reluctantly took the offer. A. That is correct. Q. It was either that or go through it and be fired, 'removal,' as marked on your final notice; correct? A. No, ma'am."

Appellant also testified he was the subject of a Glendale Police Department internal investigation and was offered medical disability to "essentially leave" the department, and he "reluctantly" accepted. The prosecutor was entitled to infer from the above testimony that although his involuntary departure from the department was under the guise of a "medical disability," appellant in reality was fired. Nonetheless, in the absence of direct evidence that appellant was in fact "fired" from the department, this comment was gratuitous and, thus, should not have been made. However, we conclude this statement was harmless and therefore not prejudicial.

*Bubble Bath Purchase Date.*

During cross-examination, the prosecutor showed appellant's ·sister the bottle of bubble bath found in appellant's car upon his arrest. After she denied knowing when it was bought, the prosecutor stated it was bought at 1:41 p.m. on January 19, 2005. The defense objected that the prosecutor was testifying. The court did not rule on the objection; rather, it simply inquired if there was a question pending. The prosecutor responded her comment was a preface to a question. She then asked, "So knowing that the bottle was bought January 19th, a couple of hours before your brother called you to pick up his [son]—your nephew . . . ; correct? 1:41 P.M., a couple of hours before [appellant] called you; Correct?" Appellant's sister responded, "I guess so if that is what the receipt says." Appellant contends the prosecutor's comments about the date when the bubble bath was purchased referred to facts not in evidence. He also contends after his sister denied knowing the date, the prosecutor repeated the comment "for no apparent purpose," because his sister had nothing else to say on that subject.

The record refutes this misconduct claim. The purchase receipt, which included the date and time of purchase, already had been placed into evidence through the testimony of Agent Osborne. Further, although the prosecutor repeated the date and time on the receipt, her comment was part of the preface to her next question. As discussed above, admission of the bubble bath receipt was error, and the prosecutor's comments emphasized this error, albeit not to the prejudice of appellant. The prosecutor, however, cannot be faulted for asking questions based on evidence that was later found to be inadmissible by an appellate court.

*Relationship with L.S.*

Appellant, while in police uniform, had once stopped L.S. for driving at night without headlights. He contends the prosecutor improperly placed before the jury hearsay about appellant's dating relationship with L.S. when she asked appellant: "[L.S.] tells us you kissed, French kissed, did you?" We point out appellant objected to this question on the ground of hearsay, not prosecutorial misconduct.

*Appellant's Knowledge of Profiling.*

During the defense case, appellant's attorney questioned appellant regarding his knowledge of profiling and how he knew he was chatting online with officers posing as underage children. Before he could respond, the prosecutor informed the court that appellant was not testifying as an expert witness. The court then clarified appellant was in fact testifying regarding his own opinion

of profiling. Appellant began his response with: "Based on my training and experience as a law enforcement officer, my . . . ." The prosecutor stated, "I object[] to that commentary. He is not an expert as a cop. He is not an expert as [to] anything. He is testifying as to what he believes . . . . I object to his commentary." The trial court sustained the objection. Appellant was then allowed to testify as to his personal understanding of profiling and that he had been trained previously in profiling by the California Narcotic Officers' Association.

Contrary to appellant's claim, the prosecutor did not commit misconduct by stating appellant was not testifying as an expert. Appellant had not been designated as an expert witness, nor was a foundation laid regarding his qualifications to testify as an expert on profiling. (See, e.g., Evid. Code, § 720, subd. (a).) The trial court therefore did not err in sustaining the prosecutor's objection. In any event, appellant was not prejudiced, because he was able to present to the jury his law enforcement background in profiling.

c. *Failure to Object*

Of the six assigned instances of improper remarks, appellant objected to the remarks of the prosecutor as misconduct in only one instance, namely, when appellant referred to the time "[w]hen I was in the D.A.'s office" while testifying about his knowledge of sex crime investigations. Appellant acknowledges he did not object to "each and every [challenged] remark made by the" prosecutor where she referred to facts not in evidence. He contends he was excused from objecting each time, because such objection would have been futile in light of the trial court's overruling of the objections he did make and also because no objection is necessary where the "prosecutor's remarks which inflame[d] the passions and prejudices of the jury constitute the sort of misconduct that is not curable by admonition . . . ." We are not persuaded.

Appellant makes no showing as to why an objection and admonition in the remaining four instances would have been futile. On the merits, the challenged remarks either did not amount to misconduct or did not rise to the level of inflaming the passions and prejudices of the jury. Appellant therefore has forfeited his misconduct claims as to the four instances where he made no objection. He also forfeited his misconduct claim regarding the comment about L.S. saying appellant French kissed her, because he failed to obtain a ruling on his objection.

d. *No Showing of Improper Vouching of Own Credibility*

Appellant contends the prosecutor was improperly "vouching for her own credibility . . . when she stated three times that she was a representative of

the State of California in front of the jury." He contends, "The clear implication of this comment is that as a representative of the state she has a credibility above that of a defense attorney."

After a review of the record, we conclude there was no improper vouching by the prosecutor. Rather, the prosecutor's reference to herself as a representative of the State of California was made solely in the context of rehabilitating a witness, which is proper. Viewed in context, the following occurred: during the cross-examination of N.N., appellant's attorney implied that the prosecutor suggested to N.N. that her molestation transpired prior to her 16th birthday.

On redirect examination, the prosecutor asked N.N. what she said when the prosecutor asked her at the preliminary hearing when she engaged in the chat with appellant. N.N. responded that she said "I was 15." N.N. confirmed that this "came out of [her] mouth first." When the prosecutor began her next question: "[N.N.], have I, as a representative of the People of the State of California," appellant's attorney objected "to the commentary." The prosecutor denied it was a commentary and stated she was "a representative of the People of the State of California." After the court overruled the objection, the prosecutor asked: "Have you ever heard from me, as a representative of the People of the State of California, . . . tell you what to say when you are in court?" N.N. responded: "No. You told me to tell the truth." This is not an example of vouching and was not improper examination by the district attorney.

### e. *Prosecutor Not Abusive or Manifestly Rude*

Appellant contends the prosecutor committed prejudicial misconduct, because she was both rude and abusive towards him while he was testifying as to what he intended to do if "Hope" in fact was a 13-year-old girl and how appellant knew "RunawayGirl14" was a police officer. He asserts "apart from the demeanor of the prosecutor, it is clear that the line of questioning itself was abusive." Based on an examination of the record we find no abuse or manifest rudeness.

During cross-examination, the prosecutor asked: "If ["Hope"] had been a 13 year old, did you have travel arrangements of how you—what you were going to do with her?" Appellant responded: "Yes, I was aware from my prior experience . . . ." The trial court sustained the prosecutor's "nonresponsive" objection. When asked for a "yes or no" answer, appellant said yes. When asked again "[w]hat were you going to do with her," appellant responded: "Greyhound is a corporate sponsor of 1-800 Runaway." At that point, the prosecutor made another "[n]onresponsive" objection. Appellant's attorney

told her: "He just answered, counsel, if you quit yelling." She replied, "The question was not what Greyhound is a corporate sponsor for." Appellant then testified: "I was going to turn her over to Greyhound for a free ride back to where she belongs and get the counseling that she needs."

In cross-examining appellant regarding "Hope," or "RunawayGirl14," the prosecutor asked if he was certain "Hope" was a police officer. Appellant asked, "At what point in time?" The prosecutor responded: "Before you went to go meet her. Yes or no?" Appellant replied: "At what point in time, ma'am?" The prosecutor asked the court to admonish appellant to answer the question. Appellant's attorney then asked the court to admonish the prosecutor "to quit yelling." Instead, the court directed appellant to "answer the question. Before you went to meet her, were you certain it [*sic*] was a police officer?"

The record shows that trial counsel requested the court to admonish the prosecutor to stop yelling. Although the prosecutor allegedly "yelled" at appellant in both instances, it is unclear from the record whether this means the prosecutor simply raised her voice or that she was screaming at appellant. There was no confirmation from the court that the "yelling" occurred. Based on the cold record before us, we cannot infer the trial court deemed the prosecutor's tone of voice was reprehensible, but not warranting an admonition or sanction. We therefore conclude the prosecutor was not abusive or manifestly rude towards appellant.

### 7. *Counts 1 and 10 Convictions Supported by Ample Evidence*

Appellant contends the evidence is insufficient to support his convictions in counts 1 and 10. We find the evidence ample.

#### a. *Standard of Review*

"A reviewing court faced with . . . a claim [of insufficient evidence] determines 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] We examine the record to determine 'whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] Further, 'the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] This standard applies whether direct or circumstantial evidence is involved. 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and

the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' [Citation.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 139 [109 Cal.Rptr.2d 31, 26 P.3d 357], fourth brackets in original.)

### b. *Count 1 ("Hope")*

█ An attempt to commit a lewd act upon a child requires both an intent to arouse, appeal to, or gratify "the lust, passions, or sexual desires of [the defendant] or the child" (§§ 288, subd. (a), 664) "and . . . a direct if possibly ineffectual step toward that goal—in other words, he attempted to violate section 288." (*People v. Memro* (1995) 11 Cal.4th 786, 862 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) █ " 'Although mere preparation such as planning or mere intention to commit a crime is insufficient to constitute an attempt, acts which indicate a certain, unambiguous intent to commit that specific crime, and, in themselves, are an immediate step in the present execution of the criminal design will be sufficient. [Citations.]' [Citation.]" (*People v. Jones* (1999) 75 Cal.App.4th 616, 627 [89 Cal.Rptr.2d 485].) No clear marker divides acts that are merely preparatory from those initiating the criminal act. Nonetheless, "the more clearly the intent to commit the offense is shown . . . 'the more likely that steps in the early stages of the commission of the crime will satisfy the overt act requirement' " of an attempt. (*Hatch v. Superior Court* (2000) 80 Cal.App.4th 170, 187–188 [94 Cal.Rptr.2d 453], citations omitted.)

Appellant contends his conviction on count 1 of attempted lewd act upon a child must be vacated, because the evidence, at best, showed he only took steps to prepare for committing a lewd act on "Hope" and that mere preparation to commit a crime is insufficient to prove he attempted to commit the crime of lewd act upon a child. Appellant contends "the facts clearly show that [he] had not reached the stage where the preparation had ended and the crime begun, so as to make the attempt complete." The record refutes appellant's contention that his actions were simply preparatory.

Appellant does not contest the fact he drove to the bus station where he expected "Hope" to appear pursuant to his devious plan. He does not challenge the fact that, upon his arrest, Viagra, condoms, a bikini, and bubble bath were discovered in his trunk. The presence of these items, which are consistent with appellant's sexually charged online chats with "Hope," and the fact he had bought the bikini shortly before his anticipated meeting with "Hope," strongly show appellant's intent to carry out his intended lewd act upon "Hope." Nothing more was necessary.

We find unpersuasive appellant's position there was no attempt, because "the events at the bus station were still in the preparation stage." Specifically, he obviously "was not going to have sex with Hope in the depot" but rather "would have had to have taken her to a hotel," and no prearrangements had been made for a hotel room or for someone else "to pick up his son . . . in Santa Clarita." In other words, appellant would have the law require the police to watch idly until he actually entered a hotel room with "Hope" to carry out his clear-cut child molesting intent. The law is otherwise.

" ' "Applying criminal culpability to acts directly moving toward commission of crime . . . is an obvious safeguard to society because it makes it *unnecessary for police to wait before intervening until the actor has done the substantive evil* sought to be prevented. It allows such criminal conduct to be stopped or intercepted *when it becomes clear what the actor's intention is and when the acts done show that the perpetrator is actually putting his plan into action*." [Citations.]' [Citation.]" (*People v. Herman* (2002) 97 Cal.App.4th 1369, 1389 [119 Cal.Rptr.2d 199], quoting *People v. Dillon* (1983) 34 Cal.3d 441, 453 [194 Cal.Rptr. 390, 668 P.2d 697].)

### c. *Count 10 (N.N.)*

Appellant challenges his conviction on count 10 of a lewd act upon a child who was 15 years old on the ground the evidence did not establish N.N. was under age 16 at the time of the molestation. We disagree. At trial, N.N. testified she was born on December 21, 1988, and was "17 and a half" years old at the time of trial. J.H., N.N.'s friend from church, was appellant's sister's daughter or stepdaughter. She was older than N.N. and 16 years old at the time of N.N.'s online chats with appellant.

In May 2005, N.N. printed out the sexually explicit chat she had had with appellant. This was the only chat she saved, which was marked as People's exhibit 79. N.N. remembered that when she chatted with appellant online, she was 15 years old. After announcing she was going to show N.N. exhibit 79, the prosecutor asked N.N. "to look at that packet and tell me if that is an accurate reflection of at least one of the chats that you had with [appellant] when you were 15 years old, on-line?" N.N. responded: "Yes, it is." She then confirmed "these chats occurred, again, when [she] were [*sic*] 15 years old." When asked, "in those chats, did you tell [appellant] that you were 15," N.N. replied, "Yes." She testified she was in the 10th grade during these chats. N.N. further testified the chat transcribed in exhibit 79 described

appellant's request that she masturbate, which she did. She testified the chat occurred in September 2004.[9]

On cross-examination, N.N. testified her chats with appellant began in September and she "turned 16 in December." She believed "about half of the chats happened" in December. The chat in exhibit 79 was the last she had with appellant.

The record thus reveals N.N.'s testimony regarding when the exhibit 79 chat occurred and how old she was at that time was conflicting. The jury, as trier of fact, was entitled to resolve this conflict, which the jury did in finding N.N. was 15, not 16 years old, at the time.

### 8. *No* Cunningham *Violation Shown*

Appellant contends the trial court committed reversible sentencing error by imposing consecutive sentences and the upper term on count 1 in violation of *Cunningham.* No *Cunningham* violation occurred. The trial court sentenced appellant to prison for the total term of five years eight months, consisting of the four-year upper term on count 1; four months, or one-third the 12-month middle term, on each of counts 2, 4, and 8; and eight months, or one-third the 24-month middle term on count 10. The court also sentenced him to six months in county jail on counts 3, 5, 6, and 7 and announced "[c]ount 9 will be stayed pursuant to [section] 654 . . . ."

#### a. Cunningham *Inapplicable to Consecutive Sentencing*

 In *People v. Black* (2007) 41 Cal.4th 799 [62 Cal.Rptr.3d 569, 161 P.3d 1130] (*Black II*), our Supreme Court held *Cunningham* was inapplicable to consecutive sentencing in California. (*Id.* at p. 806.) The court explained: "In deciding whether to impose consecutive terms, the trial court may consider aggravating and mitigating factors, but there is no requirement that, in order to justify the imposition of consecutive terms, the court find that an aggravating circumstance exists. (See § 669; Cal. Rules of Court, rule 4.425(a), (b).) Factual findings are not required. In imposing an upper term,

---

[9] Respondent stated N.N. testified the exhibit 79 chat occurred in "September 2005" and that because she did not turn 16 years old until "December 2005, appellant's offense clearly occurred when the victim was 15 years old." In his reply, appellant points out "[N.N.] was born on December 21, 1988," and thus "[c]ontrary to respondent's arithmetic, this would have caused her to turn 16 in December 21, 2004, and she would have been 16 on September of 2005." That appellant is correct is of no comfort to him. Respondent's references to September 2005 and December 2005 no doubt are simply typographical errors. N.N. testified the chat transpired in "September" and the year indicated was 2004, not 2005. She was 15 years old in December 2004. In final argument, the prosecutor pointed out "it was in September 2004 that that chat occurred, [and N.N.] was 15."

the court must set forth on the record 'facts and reasons' (§ 1170, subd. (b)), including the 'ultimate facts that the court deemed to be circumstances in aggravation.' (Cal. Rules of Court, rule 4.420(e).) But it need only cite 'reasons' for other sentencing choices (§ 1170, subd. (c)), and the reasons given for imposing a consecutive sentence need only refer to the 'primary factor or factors' that support the decision to impose such a sentence. (Cal. Rules of Court, rule 4.406(a), (b); § 1170, subd. (c); see *People v. Tran* (1996) 47 Cal.App.4th 759, 774 [54 Cal.Rptr.2d 905].)

"The high court's decision in *Cunningham* does not call into question the conclusion we previously reached regarding consecutive sentences. The determination whether two or more sentences should be served in this manner is a 'sentencing decision[] made by the judge after the jury has made the factual findings necessary to subject the defendant to the statutory maximum sentence on each offense' and does not 'implicate[] the defendant's right to a jury trial on facts that are the functional equivalent of elements of an offense.' ([*People v.*] *Black* [(2005)] 35 Cal.4th [1238,] 1264 [29 Cal.Rptr.3d 740, 113 P.3d 534].)" (*Black II, supra,* 41 Cal.4th at pp. 822–823.)

In adhering to the above holding in *Black II,* as we must (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937], we reject, as untenable, appellant's position to the contrary that imposition of consecutive sentences in this matter violated *Cunningham.*

### b. *Upper Term Not Violative of* Cunningham

Appellant contends the trial court violated *Cunningham* by imposing the four-year upper term on count 1 based on facts not found true by the jury. The jury convicted appellant, as charged, of attempted lewd act on a child (count 1 ("Hope")); attempted sending harmful matter (counts 2, 4, 8 [no victims]; attempted child molesting (counts 3 ["Becky"], 5 ["Hailey"], 6 ["Jenny"], 7 ["Sammy"]); child molesting (count 9 [N.N.]); and lewd act upon a child (count 10 [N.N.]). Appellant was sentenced to prison for a total of five years eight months. In denying probation, the court found no mitigating circumstances and discussed various aggravating circumstances.

The trial court imposed the four-year upper term on count 1. However, no *Cunningham* violation transpired because the trial court was justified in relying on the multiple-victim circumstance in selecting the upper term. With regard to "multiple victims," the court stated: "[A]s the People pointed out, there are a number of victims in this case. Not only your family, but all the victims that were victimized by you during these crimes. [¶] . . . [¶] I know the victims that we have in this case, most of which were undercover

officers. But one was not an undercover officer."[10] We conclude although multiple victims is no longer expressly enumerated as a circumstance in aggravation in the California Rules of Court,[11] the existence of multiple victims continues to be a valid aggravating circumstance that would support the imposition of the upper term. Rule 4.408(a) provides: "[E]numeration in these rules of some criteria for the making of discretionary sentencing decisions does *not prohibit* the application of *additional criteria* reasonably related to the decision being made. Any such additional criteria must be stated on the record by the sentencing judge." (Italics added.)

In *People v. Calhoun, supra,* 40 Cal.4th at page 400, our Supreme Court resolved affirmatively the issue of "whether an upper term sentence may be imposed based upon a 'multiple victims' aggravating factor if only one victim was named in each count." (But see *People v. Sandoval, supra,* 41 Cal.4th at p. 842, fn. 5.) In view of the foregoing, we conclude the trial court was justified in imposing the upper term on count 1 based on the multiple-victim circumstance.

---

[10] At sentencing, the trial court addressed appellant and stated: "[Y]ou were an ex-police officer, and . . . started with Burbank Police Department when you were 18 years old. One of the youngest officers, I believe, on Glendale Police Department, and spent another 20 years there.

" . . . [Y]ou became an attorney . . . [, b]ut unfortunately, you used your position to prey on these victims. And the victims were particularly vulnerable. And as they testified during the trial, they didn't know what to do because you were a police officer in uniform. So when you came on to them, they were afraid. They said, hey, he's got a gun. What am I supposed to do?

"All of the victims were minors. It goes back a substantial length of time. At least 15 years that we know about, as far as this activity, while you were still a police officer. You did occupy a position of leadership and dominance as a police officer and as a member of the California [State Bar]. [¶] . . . [¶]

"During the trial, you know it came out that you had attempted to dissuade some of the witnesses from their testimony. It appeared you violated a court order to stay away from one of the victims prior to the trial.

"And the crimes themselves indicated, you know, planning and sophistication. It looked like you had I don't know how many people on the internet you were talking to at one time, because we just kept coming up with more and more victims. Or the People did.

"You used your position to promote your defiance.

"And as the People pointed out . . . *there are a number of victims in this case.* Not only your family, but *all of the victims that were victimized by you during these crimes.*

"And I don't think we really know how many victims are out there. It could go back as far as 1991.

"I know the victims that we have in this case, most of which were undercover officers. But one was not an undercover officer." (Italics added.)

[11] All further rule references are to the California Rules of Court. Effective January 1991, "multiple victims," which had been listed as an aggravating circumstance in former rule 421(a)(4), was deleted. The Advisory Committee comment explained it "was deleted to avoid confusion; cases in which that possible circumstance was relied on were frequently reversed because there was only a single victim in a particular count."

For a contrary conclusion, appellant relies on the fact that some of the victims were not "real people" and therefore could not have been "harmed or injured in some way." We find this to be a distinction without a difference. Appellant's culpability is not lessened by the absence of actual harm or injury. He was convicted of *attempted* lewd act as to these victims, which does not require as an element that the victim be harmed or injured. Additionally, we need not, and therefore do not, delve further into appellant's point, which he urges without citation to applicable authority. (See, e.g., *People v. Stanley* (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481] [" '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration. [Citations.]' [Citations.]"].)

### 9. *Remand for Imposition and Stay of Execution of Sentence*

At sentencing, the trial court did not pronounce sentence on count 9. Rather, the court simply announced "[c]ount 9 will be stayed pursuant to [section] 654 . . . ." As the parties acknowledge, the trial court committed unauthorized sentencing error by failing first to pronounce sentence on count 9 and then stay execution of that sentence. The judgment therefore must be reversed and the matter remanded with directions for the trial court to correct this sentencing error. (See generally *People v. Scott* (1994) 9 Cal.4th 331, 354, fn. 17 [36 Cal.Rptr.2d 627, 885 P.2d 1040] ["It is well settled . . . the court acts in 'excess of its jurisdiction' and imposes an 'unauthorized' sentence when it erroneously stays or fails to stay execution of a sentence under section 654."]; *People v. Miller* (1977) 18 Cal.3d 873, 886 [135 Cal.Rptr. 654, 558 P.2d 552] ["When a defendant suffers multiple convictions, sentencing for some of which is precluded by operation of section 654, an acceptable procedure is to sentence defendant for each count and stay execution of sentence on certain of the convictions to which section 654 is applicable."]; accord, *People v. Deloza* (1998) 18 Cal.4th 585, 591–592 [76 Cal.Rptr.2d 255, 957 P.2d 945].)

### 10. *Remand for Imposition of Court Security Fee*

The trial court failed to impose *any* $20 court security fee mandated under section 1465.8, subd. (a)(1), which became operative on August 17, 2003. In *People v. Alford* (2007) 42 Cal.4th 749 [68 Cal.Rptr.3d 310, 171 P.3d 32], our Supreme Court held the fee applied to crimes committed prior to this date and that such application did not violate either the retroactivity bar of section 3 or the federal and state proscriptions against ex post facto laws. (*People v. Alford*, at p. 752.) Such fee is mandated as to " 'every conviction,' " even if the sentence on a conviction was stayed. (*Crittle, supra*, 154 Cal.App.4th at pp. 370–371.)

 As the parties acknowledge, the trial court erred in failing to impose a $20 court security fee. A $20 court security fee was mandated for each of appellant's 10 convictions, although sentence on count 9 was stayed (§ 654), and his crimes in counts 3, 4, and possibly 6 (committed "[o]n or between May 5, 2003 and November 13, 2003") were committed prior to its operational date. Respondent proposes the abstract of judgment should be *modified* to reflect the $20 court security fee for each of the 10 convictions (an aggregate of $200). "It is, of course, important that courts correct errors and omissions in abstracts of judgment. An abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize. [Citation.]" (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 [109 Cal.Rptr.2d 303, 26 P.3d 1040].)

Accordingly, it is the judgment that must be modified to reflect imposition of a court security fee in the aggregate amount of $160. The abstract of judgment shall be amended to reflect the judgment as so modified.

## DISPOSITION

Appellant's sentence is reversed with respect to (1) the convictions on counts 3, 6, and 9; (2) the trial court's failure to impose an appropriate sentence on count 9 and then stay execution of that sentence; and (3) the court's failure to impose a $20 court security fee on each of the eight convictions, in the aggregate amount of $160. The matter is remanded with directions to conduct further proceedings consistent with the views expressed in this opinion. In all other respects, the judgment is affirmed. The superior court is directed to prepare an amended abstract of judgment to reflect the judgment as corrected.

Rubin, J., and Flier, J., concurred.

**RUBIN, J.,** Concurring.—I write this concurrence for two reasons: first, to explain why I join in the majority's reversal of appellant's convictions under counts 3 and 6 for attempted misdemeanor molestation of a minor under 14 years old; and second, to call to the Legislature's attention what may have been an oversight when it modified the statute of limitations for certain crimes, an oversight the Legislature may wish to correct.

The usual statute of limitations for misdemeanors is one year. (Pen. Code, § 802, subd. (a).)[1] Appellant contends the trial court erred in letting the jury convict him of the attempted misdemeanor molestation of "Becky" (count 3)

---

[1] All future statutory references are to the Penal Code.

and "Jenny" (count 6) because the People did not file those charges against him within one year of his commission of the offenses. Appellant acknowledges section 802, subdivision (b) extends the statute of limitations for misdemeanor child molestation of a minor under 14 years old to three years. He contends, however, that the three-year extension does not apply to his *attempt* to commit those crimes. I reluctantly agree he is correct.

Several legal principles compel me to accept appellant's contention. First, the attempt to commit a crime is a separate offense from successfully completing the same crime. (*People v. Reed* (2005) 129 Cal.App.4th 1281, 1283 [29 Cal.Rptr.3d 215] [sentencing statute mentioning commission of offense did not apply to attempted commission because an "attempt is an offense 'separate' and 'distinct' from the completed crime"]; *People v. Le* (1984) 154 Cal.App.3d 1, 10 [200 Cal.Rptr. 839] ["attempted crimes are considered to be separate and distinct . . ."].) In acknowledging the difference between an attempted crime and a completed one, the law allows the difference to have real consequences. For example, punishment for an attempted crime is ordinarily less severe than punishment for a completed crime. (§ 664.) As one court held, a sentencing statute (§ 667.6) that applied to the completed crime of sodomy in concert did not apply to attempted sodomy because the statute did not mention the attempt to commit the offense. (See *People v. Reber* (1986) 177 Cal.App.3d 523, 535 [223 Cal.Rptr. 139], disapproved on another point in *People v. Hammon* (1997) 15 Cal.4th 1117, 1123 [65 Cal.Rptr.2d 1, 938 P.2d 986]; see also *People v. Thomas* (1990) 218 Cal.App.3d 1477, 1490 [267 Cal.Rptr. 865].) The different treatment of attempted and completed crimes persists in at least one decision involving a statute of limitations. In that decision, the appellate court in *People v. Abayhan* (1984) 161 Cal.App.3d 324 [207 Cal.Rptr. 607], noted there is no statute of limitations for murder, but a three-year statute of limitations applies to attempted murder if the attempt was not willful, deliberate, and premeditated. (*Id.* at p. 329; see also §§ 799, 664, subd. (a), 189.)

Well-established rules of statutory construction require me to accept appellant's interpretation of the silence in section 802, subdivision (b) concerning attempted misdemeanor child molestation. First, courts are loath to add language missing from a statute. (*Wells Fargo Bank v. Superior Court* (1991) 53 Cal.3d 1082, 1097 [282 Cal.Rptr. 841, 811 P.2d 1025]; *People v. Buena Vista Mines, Inc.* (1996) 48 Cal.App.4th 1030, 1034 [56 Cal.Rptr.2d 21].) The unwillingness of courts to add language is especially strong when statutory language was readily available to the Legislature if it had wished to express an intention different from the statute's plain meaning. For example, penal statutes commonly use the phrase "commit or attempt to commit" (or similar words) if the statute covers both the attempted and completed crimes. (See, e.g., § 189 ["perpetration of, or attempt to perpetrate" predicate offenses];

§ 12022 [firearm enhancement applies to "commission of a felony or attempted felony"].) Granted, authority supports adding language to a statute in the rare circumstance that its absence is clearly an accident and its inclusion is needed to give purpose to the statute. (See, e.g., *People v. Buena Vista Mines, Inc., supra,* at p. 1034 [language expressed legislative intent that offense be a felony even though statute did not state "felony" or " 'state prison' "].) Here, however, section 802, subdivision (b) makes sense within its four corners, and its legislative history does not mention attempted molestation being on legislators' minds. Without legislative history revealing the Legislature intended a three-year statute of limitations for both attempted and completed molestation, I cannot say with certainty that the Legislature accidentally failed to include attempted molestation in section 802, subdivision (b)—and thus I may not interpret the statute to say it does.

Finally, the rule of lenity supports appellant's interpretation. Under that rule, a court must generally interpret an ambiguous criminal statute in the defendant's favor.[2] That rule has been applied to adopt a shorter statute of limitations favored by a criminal defendant instead of a longer one urged by the prosecution. (*Gasaway v. Superior Court* (1977) 70 Cal.App.3d 545, 550 [139 Cal.Rptr. 27].)

Although I believe we are compelled to apply a one-year statute of limitations to attempted misdemeanor child molestation, there are sound reasons for a statute of limitations that treats both attempted and completed misdemeanor molestation the same. The legislative history discusses two principal reasons for a three-year statute of limitations. First, children often delay reporting molestation to a responsible adult, such as a parent, teacher, or doctor. The delay frequently arises from shame, embarrassment, or other feelings that make children hide, rather than report, their victimization. To ensure the harmful emotions the molester spawns in a child do not work to the molester's advantage, the Legislature chose to give children more time to report the crime by enacting a longer statute of limitations. The same reticence to report attempted child molestation is likely to exist—perhaps more so, because the conduct may appear less threatening to the child.

The second reason the legislative history discusses for a longer statute of limitations involves the connection between misdemeanor molestation and more serious sexual offenses. Under a phenomenon a proponent of a three-year statute of limitations described as "grooming," child welfare authorities have observed that sexual conversation, photographs, and invitations of the sort appellant pursued here could accustom a child to sexual behavior. By

---

[2] The rule of lenity applies when ambiguous statutory language permits two reasonable interpretations. Although arguably section 802, subdivision (b) is not ambiguous, to the extent the People argue that it is, then the rule of lenity applies.

sexualizing a child with sexual banter and other conduct short of touching, a molester can prepare the child to be receptive to more direct sexual contact down the road. A longer statute of limitations recognizes that the molester's sexualization of the child could be a long journey warranting a longer time to allow criminal prosecution. Attempted child molestation is equally likely to be part of this grooming.

I believe the Legislature's two reasons for enacting a three-year statute of limitations for misdemeanor child molestation apply with equal force to attempted molestation. However, unless and until the Legislature acts with clearer direction to the courts, I agree with the majority's conclusion that we must reverse and dismiss appellant's convictions under counts 3 and 6 for attempted molestation.

Appellant's petition for review by the Supreme Court was denied April 1, 2009, S169774.