Filed 7/2/14  P. v. Perez CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL PEREZ,<br><br>    Defendant and Appellant. | B247105<br><br>(Los Angeles County<br>Super. Ct. No. BA380819) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Craig J. Mitchell, Judge.  Affirmed, as modified.

David Paquin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Michael Perez appeals from his conviction of four counts of attempted kidnapping and one count of misdemeanor impersonating an officer.[1]  He contends: (1) the trial court prejudicially erred by admitting evidence of uncharged sexual assaults; (2) insufficient evidence supported the attempted kidnapping convictions; (3) denial of his new trial motion was error; (4) the prosecutor committed prejudicial misconduct; (5) it was error to allow a police officer to testify that he believed the victim was telling the truth when he interviewed her; (6) there was no evidence that defendant was arraigned after his first trial; and (7) the case should be dismissed in the furtherance of justice.  We affirm as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

*A.     The People's Case*

     1.     <u>Carolina H. Attempted Kidnapping (Count 1)</u>

Viewed in accordance with the usual rules on appeal (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358), the evidence established that victim Carolina H. was 18 years old in late January 2011, but her diminutive size made her appear much younger.  On

---

[1]     All undesignated statutory references are to the Penal Code.  Defendant was charged by amended information with three counts of attempted kidnapping of Carolina H. (counts 1, 5 and 6), one count of attempted kidnapping of Barbara H. (count 2) and one count of misdemeanor impersonating an officer (count 4).  There was no count 3.  Prior conviction enhancements were alleged pursuant to the Three Strikes law (§ 1170.12, subds. (a) –(d); § 667, subds. (b)-(i)), as well as section 667.5, subdivision (b) and section 667, subdivision (a).  After a jury was unable to reach a unanimous verdict, a mistrial was declared on December 15, 2011.  Following a second jury trial, defendant was convicted on all counts.  Defendant admitted four Three Strikes prior convictions, two prior serious felony convictions (§ 667, subd. (a)(1)) and that he served two prior prison terms (§ 667.5, subd. (b)).  He was sentenced to 35 years to life on count 1, comprised of 25 years to life pursuant to the Three Strikes law, plus a consecutive ten years (two five year terms for the § 667, subd. (a)(1) priors); consecutive life sentences were imposed on counts 5 and 6; a concurrent life sentence was imposed on count 2; a concurrent six month sentence was imposed on count 4.  Defendant timely appealed.

three occasions in late January and early February 2011, defendant accosted Carolina on the street. All three incidents occurred within a two mile area.

Carolina was unsure of the exact date of the first incident, but believed it occurred during the week of January 17, 2011. Carolina recalled that she was waiting for a bus at Figueroa and 58th Streets at about 2:30 p.m. when defendant pulled up in a gray, four-door Toyota and gestured for Carolina to come over to his car. Carolina ignored him. After awhile, defendant drove away. When the bus arrived, Carolina got on and took a window seat. Looking out the window of the moving bus a few minutes later, Carolina saw defendant driving alongside the bus. Carolina ignored defendant as he repeatedly gestured for her to come over. When Carolina got off at her stop, Martin Luther King Boulevard, she did not see defendant. She walked across the street to her next bus stop, where two men were also waiting. After awhile, Carolina noticed defendant parked at the curb. Through his open window, defendant called Carolina over, but she told him to leave her alone. Carolina called her sister, Ilsy, and told her that a man was following her. Defendant eventually drove away and Carolina got on her bus. I. H. testified that Carolina sounded afraid when she asked I. to pick her up at the bus stop because a man in a gray car was following her.

On February 3, 2011, Carolina went with her parents to the police station to report this incident and two subsequent incidents involving defendant. Regarding this incident, Carolina told police Officer Robert Smey that she was walking on the east side of Figueroa toward Slauson at about 2:30 in the afternoon to catch a bus when she noticed a gray Toyota slowly driving slightly behind her. The driver, a light-skinned male Hispanic, was looking at her.

2. Barbara H. and Carolina H. Attempted Kidnappings (Counts 2 and 5) and Impersonating a Police Officer (Count 4)

On January 31, 2011, Carolina and her younger sister, 15-year-old Barbara H., left home at about 10:00 a.m. to drop off some papers at Carolina's school, located on

3

Figueroa and 60th Street.**2** From the school, they started to walk to where their mother worked, about a block away. They were on the corner of Figueroa and 60th Street – two blocks from where the earlier incident took place – when defendant made a U-turn and pulled alongside of them. Defendant asked them why they were not in school and said he was going to give them a ticket. Defendant flashed a badge and said, " 'come here' in the car." Carolina initially thought defendant was a police officer, but then quickly recognized him as the man who had bothered her previously; he was in the same car. Carolina told defendant to leave them alone. Defendant shined a flashlight into Barbara's eyes, causing Barbara to freeze. When defendant took his seatbelt off, Carolina thought he was going to snatch them so she grabbed Barbara and they ran towards an elementary school about a block away. As they were running, Carolina looked back in an effort to get the license plate number of defendant's car, but was only able to get some of the digits, which she wrote down on her hand. Carolina and Barbara did not go into the elementary school because Carolina did not want the person at the front desk to call the police. After waiting outside the school for a little while, Carolina concluded that defendant had gone so the sisters went to meet their mother. Barbara told their mother that someone had been following Carolina. Carolina copied the numbers from her hand onto a piece of paper, which she gave to her mother.

Barbara's recollection of the incident was essentially identical to Carolina's. Barbara recalled the incident occurred sometime between 11:00 a.m. and noon. After defendant made the U-turn and pulled up next to them, he said, "Don't y'all know a young lady is supposed to be at school?" After flashing what looked like a police badge, defendant unbuckled his seat belt and said, "Come here." Defendant shined a flashlight at them, which momentarily blinded Barbara. Carolina grabbed her arm and they ran away.

---

**2** At trial, Carolina could not recall the exact date of this second incident, but she previously testified that it occurred on January 31, 2011. Carolina also told Smey that the second incident occurred three days before she reported it on February 3, 2011 (i.e., on January 31, 2011).

4

A. H., recalled that when her daughters, Carolina and Barbara, arrived at her workplace one morning in January 2011, Carolina appeared scared and Barbara was crying. They told A. that a man in a car had chased them and Carolina said it was the second time he had done so. A. drove around with Carolina and Barbara in the back seat of her car looking for the gray Toyota so that she could obtain the full license plate number.

Carolina told Smey that she was walking with her little sister southbound on the west side of Figueroa at about 59th Street when defendant pulled up next to them in the same car he had been driving when he accosted Carolina at the bus stop. Defendant got out of the car, held up a badge and said, "Come here. Get in the car. You ladies should be in school. You're going to get tickets. I'm the police." Recognizing him as the man who had followed her, Carolina did not believe he was a police officer and thought he was trying to get her into the car to kidnap her. Carolina said to defendant, "No, I remember you. You're the guy that followed me last week." Defendant denied the accusation. When defendant started to move around the car door, Carolina grabbed Barbara's arm and they ran away.

### 3. Carolina H. Attempted Kidnapping (Count 6)

Carolina spent the morning of February 2, 2011 passing out advertizing flyers on the corner of Florence and Broadway with co-worker Tequana Ball. At about lunch time, Carolina and Ball were in the crosswalk, crossing Broadway, when Carolina noticed defendant stopped for a red light on northbound Broadway. Through the open car window, defendant said to Carolina, "Beautiful." Carolina told defendant to leave her alone, cursed at him and then threw a can of soda at him. Carolina wrote down the last three digits of his license plate number. Defendant drove away, obviously mad at Carolina for throwing the soda at him. Carolina and Ball resumed passing out flyers, but when Carolina saw defendant make a U-turn about half a block north of Florence, she became frightened. Carolina and Ball jaywalked back across Broadway and entered a donut shop to hide from defendant. From inside the donut shop, Carolina saw defendant

5

parked at the curb, looking into the shop. Carolina and Ball waited in the donut shop for about an hour. During that time, defendant drove away.[3] Carolina reported all three incidents to the police the next day. That night, two officers came to the house to show Carolina and Barbara a photographic lineup (six-pack) from which they identified defendant.

Officer Smey testified that Carolina's description of the three incidents remained consistent over several hours of questioning, even when Smey intentionally juxtaposed facts to test her. Smey ascertained that the license plate number Carolina wrote down belonged to a Toyota registered to defendant.

That same day, another officer created a photographic lineup (six-pack) which included defendant's photograph in position number four. That evening, two officers met with Carolina and Barbara at their home to show them the six-pack. Each sister immediately identified defendant. Barbara wrote: "Number 4 was the one that was following me and my sister. He flashed the light at us and he said, 'What are y'all girls doing out of school?' And he grabbed the booklet, and he was about to get out of the car and that's when we ran. He told us to get into the car. He showed us a badge." Carolina, who started sobbing when she saw the six-pack, wrote: "The person in photo 4 is the person who told me to get in the car and I run away with my sister. He follow me three times and he also told me he was a police officer. He got out of his car trying to put me and my sister, but we run away from him."[4] Carolina and Barbara said defendant shined a blue flashlight at them. Defendant was arrested at his home that night. The gray Toyota was parked in the garage. In it, police found two flashlights – a large blue one

---

**3** The prosecutor was unable to make contact with witness Ball and defendant agreed to allow Ball's prior testimony to be read to the jury. Ball recalled that the car Carolina pointed out was a black Toyota. She estimated that the man in that car was about 40 years old, but she could not see him well enough to identify him.

**4** At trial, Carolina did not remember that defendant said he was a police officer, but she said her recollection of events was clearer on February 3, 2011, when she wrote that on the six-pack.

close to the center console and a small black one in the glove compartment. Defendant's home was also searched. A cell phone and a badge were recovered.

### 4. Evidence Code Section 1101, Subdivision (b) Evidence

Four other witnesses testified to past events involving defendant. D. H. was 17 years old on April 22, 1987. At about 3:30 p.m. that day, D. was walking quickly northbound on Woodruff because she was late to pick up her little brother from school. When defendant pulled over and asked for directions, D. said she did not know the location and that she was in a hurry. As D. continued walking, defendant drove along side of her and repeated his question. When D. told him she was in a hurry to pick up her brother, defendant offered to drive her there. D. twice refused, but the third time defendant offered, D. accepted and got into defendant's car. When defendant drove past the school, D. realized her mistake. She asked defendant to let her out, but he refused. Defendant turned into an alley and when D. tried to get out of the car, defendant attacked her. D. fought back but defendant threatened to kill her if she did not stop screaming. Defendant assaulted D.

Dana G. testified that at about 3:15 p.m. on June 4, 1987, the day before her 15th birthday, she was walking home from school alone when defendant drove past her, then made a U-turn, pulled up beside her and offered her a ride home. Defendant was not intimidating and she was in a hurry, so Dana accepted. She realized her mistake when defendant did not turn where he should have to take her home. In response to Dana's repeated requests that he let her out, defendant reassured her that he was taking her home. Dana was afraid to jump out of the moving car. After defendant turned into an alley, Dana started to gather her things to get out of the car. When defendant grabbed her elbow, Dana started screaming. Defendant put her into a headlock and threatened to kill her if she did not stop screaming. Defendant assaulted Dana.

At about 10:00 a.m. on August 2, 2000, Police Officer Christopher Bolt was part of an undercover team surveilling defendant. Over the course of an hour, Bolt first observed defendant watching a young girl sitting alone on a bus bench; defendant drove

7

past the girl, then made a U-turn and pulled up to the curb in front of her. Defendant leaned over and spoke to the girl through the open passenger side window. After a few minutes, defendant drove away. Bolt immediately made contact with the girl, who seemed upset. The girl, Evelyn D., said defendant had asked if she wanted a ride home, which she declined. Bolt resumed his surveillance of defendant, who drove around aimlessly, often slowing down to look at female pedestrians. Eventually, defendant drove to an elementary school, which he slowly drove past. Defendant next drove to a second elementary school, which he slowly circled. Defendant slowed down to look at a girl crossing the street, but there was a teacher nearby and defendant continued on. After driving past a teenage girl crossing the street, defendant made a U-turn but by the time defendant had returned to where the girl had been, the girl had gone into a store. After driving around a little more, defendant pulled into the parking lot of an auto parts store where a girl in her late teens was standing looking into the engine compartment of a car. Defendant parked and started walking towards the girl, but stopped when a young man came out of the store and joined the girl. After staring at them for awhile, defendant got back into his car and drove away.

Evelyn D., the girl on the bus bench Bolt saw defendant talking to the morning of August 2, 2000, testified that she was 15 years old that day. She recalled defendant pulling up to the bus stop and questioning her about her name and her destination. Evelyn declined defendant's repeated offers of a ride. Defendant was polite but "very, very pushy," which scared her. Evelyn tried to calculate what she could do if defendant tried to grab her. When a male school friend sat down next to Evelyn, defendant immediately drove away.

## B.    The Defense Case

Defendant presented several alibi witnesses. Douglas Nuss, a merchandiser and salesman, testified that he attended church with defendant, whom he considers a good friend. Defendant was working with Nuss from 7:00 a.m. until 6:00 p.m. on Thursday, January 27, 2011. Defendant also worked for Nuss on January 19th and 20th. Dave

8

Masone, a friend and neighbor of defendant's, testified that defendant was with him at his air conditioning shop from 2:00 until 4:00 p.m. on a Friday in late January 2011, possibly January 28th, and again the next day, possibly January 29th, from 7:00 a.m. to 4:00 p.m. The Regional Operations Manager for New Breed Logistics testified that from 10:30 a.m. until 12:44 p.m. on January 31, 2011, defendant was being interviewed for a job at the company's Santa Fe Springs office. The Chief Financial Officer and the Director of Human Resources for Superior Grocers each testified that they participated in a two-hour interview of a person named "Michael Perez," beginning at about 9:15 a.m. on February 1, 2011, at the company's Santa Fe Springs office. The home address noted on that person's employment application was defendant's home address. Neither witness could identify defendant as the person they interviewed that day.

*C.*     *Rebuttal*

Following his arrest on February 3, 2011, defendant was interviewed at the police station. A recording of the interview was played for the jury and the jury was given a transcript of the recording. In the interview, defendant states that he is not sure where he was at 10:30 a.m. on January 31st, but thought he might have been ministering to the homeless on Figueroa. On February 2nd, he was at 3333 Florence doing a prison ministry. Defendant did not mention attending any job interviews. After initially denying that he had followed a girl, defendant admitted flashing his light at a girl on Figueroa. Defendant explained that he thought the girl was a prostitute because most of the girls on Figueroa are prostitutes. Defendant did not tell her to get into his car, he only asked if she was working. When the girl said no, defendant drove on. Defendant said, "I thought she was a prostitute, and I tell them, get back in because there was a sheriff officer uh, and I said 'what you guys doing with these, with these prostitutes, aren't you guys doing anything?' and they said we're doing the best we can." Defendant maintained that this was his only contact with the girl.

9

A.      *Evidence of Prior Misconduct Was Admissible to Prove Intent and Common Plan*

Defendant contends the trial court erred in admitting evidence that defendant kidnapped and assaulted D. and Dana in 1987.  He makes three arguments:  (1) evidence that defendant assaulted D. and Dana was inadmissible under Evidence Code section 1101, subdivision (b); (2) the evidence was inadmissible under Evidence Code section 1108 because he was not charged with sexual assault in this case; and (3) the evidence was more prejudicial than probative under Evidence Code section 352.  We find none of these arguments persuasive.

Evidence Code section 1101, subdivision (b) makes evidence that the defendant committed a crime or other specific instance of misconduct admissible to prove intent, preparation or plan, among other things.  " 'When reviewing the admission of evidence of other offenses, a court must consider:  (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant. [Citation.]  Because this type of evidence can be so damaging, "[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded." [Citation.]' [Citation.]" (*People v. Fuiava* (2012) 53 Cal.4th 622, 667–668.)  The requisite degree of similarity between the uncharged misconduct and the charged offense varies depending upon what fact the evidence is offered to prove.  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402-403.)

---

[5]      The Attorney General points out in its Respondent's Brief that although the trial court orally pronounced that the sentence on count 4 (impersonating an officer) was to run concurrent with the other sentences, both the minute order and the abstract of judgment state that the sentence is consecutive.  Defendant did not claim sentencing error but our review of the record reveals that the Attorney General is correct.  Accordingly, we direct the trial court to correct its minute order and abstract of judgment to reflect that sentence on count 4 is concurrent, and to send a copy of the amended abstract to the Department of Corrections.

The least degree of similarity is required when the evidence is offered to prove the defendant's intent which was the case here. (*Ewoldt, supra*, 7 Cal.4th at p. 402.) It is well settled that " ' "if a person acts similarly in similar situations, he probably harbors the same intent in each instance" [citations], and that such prior conduct may be relevant circumstantial evidence of the actor's most recent intent. The inference to be drawn is not that the actor is disposed to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution. [Citations.]' [Citations.]" (*People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 754.) In *People v. Johnson* (2013) 221 Cal.App.4th 623, the following similarities were found sufficient to justify admission of prior misconduct evidence to prove intent: the current crime and the prior crime were home invasion robberies for the purpose of obtaining drugs, the defendant used the same modus operandi to gain entrance (knocking and then forcing entry when the victim opened the door), defendant was the "mastermind" and was assisted by two accomplices in both crimes. (*Id.* at p. 635.)

Evidence offered to prove a common scheme or plan – also present here – requires somewhat more certainty than that required to prove intent. Such evidence " 'must demonstrate "not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." ' [Citation.] It must show the existence of a plan, rather than a series of similar, spontaneous acts. [Citations]." (*People v. Tackett* (2006) 144 Cal.App.4th 445, 459.) " '[A] common scheme or plan focuses on the manner in which the prior misconduct and the current crimes were committed, i.e., whether the defendant committed similar distinctive acts of misconduct against similar victims under similar circumstances.' [Citation.]" (*People v. Walker* (2006) 139 Cal.App.4th 782, 803.) While the common features must indicate the existence of a plan, the plan need not be distinctive or unusual. (*Ewoldt, supra*, 7 Cal.4th at p. 403.)

Although not controlling, *Walters v. Maass* (1995) 45 F.3d 1355, is instructive. In that case, the defendant was charged with attempted kidnapping of a 13-year-old girl he

tried to lure to his truck with the ploy of helping him search for a nonexistent German shepherd. Over defendant's objection, the Oregon state court admitted evidence that he used the same ploy seven years earlier when he successfully kidnapped another 13-year-old girl, took her to his trailer and sexually assaulted her. The Ninth Circuit held that the evidence was relevant to the defendant's intent; the prior act was not too remote in time since the defendant had been incarcerated during much of the interim; and the trial court reduced the danger of unfair prejudice by giving a limiting instruction. The court concluded that the evidence was sufficient to show the defendant's intent to kidnap the victim, but not sufficient to show his intent to sexually assault her. (*Id*. at pp. 1357-1359.)

Here, defendant objected to the admission of prior misconduct evidence.[6] He argued: (1) the theory of defense was that defendant had an alibi for when the charged crimes occurred and therefore the intent of the perpetrator was not an issue; (2) the prior misconduct was not similar enough to be admissible to prove identity under Evidence Code section 1101, subdivision (b); and (3) the evidence was more prejudicial than probative under Evidence Code section 352. The trial court found the prior misconduct evidence was relevant to prove defendant's intent to kidnap Carolina and Barbara, as well as to prove common plan or scheme. Finding the evidence that D. and Dana were also sexually assaulted was more prejudicial than probative under Evidence Code section 352, the trial court ordered their testimony sanitized to refer only to an "assault" and not to a "sexual assault."

We find no error in the trial court's rulings. The prior misconduct and the charged offenses were committed against similar victims – young girls sitting at bus stops or walking alone (or in the case of the incidents involving Carolina and Barbara and Carolina and Ball, two young girls walking alone). In each incident defendant's actions followed a similar pattern – he first drove by the potential victim, then made a U-turn to

---

[6] Although he objected to both the 1987 incidents involving D. and Dana, as well as the 2000 incident involving Evelyn in the trial court, his Opening Brief focuses on solely on the 1987 incidents. Accordingly, we do not discuss the 2000 incident.

pull up alongside the victim and urged the victim to get into his car using a ruse (e.g. offering to give the victim a ride to wherever she was going) or a display of authority (displaying a badge to make the victim believe he was acting under color of authority and she had no choice but to obey). The prior misconduct and the charged offenses were similar enough to make the prior misconduct evidence admissible under Evidence Code section 1101, subdivision (b) to prove intent as well as common plan or scheme. Inasmuch as we find the trial court did not abuse its discretion in finding the challenged evidence admissible under Evidence Code section 1101, subdivision (b), we need not consider defendant's contention that it was inadmissible under Evidence Code section 1108.

Defendant's argument that evidence that defendant "assaulted" D. and Dana was irrelevant because he was not charged with any sexual assault in this case misses the point. The evidence that D. and Dana voluntarily got into defendant's car but he physically assaulted them when they tried to get out is probative of the forcible movement element of kidnapping. Thus, it is relevant as circumstantial evidence from which a reasonable juror could infer that defendant also intended to forcibly restrain Carolina and Barbara, even if they initially got into his car voluntarily.

Finally, we find no merit in defendant's argument that the prior misconduct evidence was more prejudicial than probative under Evidence Code section 352. The challenged evidence was extremely probative on the issue of intent to kidnap. Moreover, any danger of prejudice was alleviated by sanitizing the testimony and by the limiting instructions given, including CALCRIM Nos. 303 and 375.

B.      *The Attempted Kidnapping Convictions Are Supported by Substantial Evidence*

Defendant contends the attempted kidnapping convictions are not supported by substantial evidence.[7] He argues there was no evidence that defendant "ordered [the

---

**7**      Defendant also asserts that the impersonating an officer conviction is not supported by substantial evidence. But he offers no coherent argument or legal authority. Accordingly, we deem the contention waived. (*Kaufman v. Goldman* (2011)

13

victims] into his vehicle.  He never got out of his vehicle.  He never even asked them to get into his vehicle.  It is arguable that he motioned or asked them to come closer, but that is not an attempted kidnapping."  We find substantial evidence supports all four convictions.

### 1. Standard of Review

The standard of review for a challenge to the sufficiency of the evidence is well settled.  We review the whole record, in the light most favorable to the judgment, to determine whether there is evidence that is reasonable, credible, and of solid value, such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. " 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  [Citation.]'  [Citation.]  A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict.  [Citation.]  [¶] The same standard governs in cases where the prosecution relies primarily on circumstantial evidence.  [Citation.]"  (*Zamudio, supra*, 43 Cal.4th at pp. 357–358.)

### 2. Elements of Attempted Kidnapping

"Every person who forcibly, or by any other means of instilling fear, steals or takes, holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping." (§ 207, subd. (a).)  "[A]sportation by fraud alone does not constitute a general kidnapping offense in California."  (*People v. Green* (1980) 27 Cal.3d 1, 64, overruled on another

195 Cal.App.4th 734, 743 ["Every argument presented by an appellant must be supported by both coherent argument and pertinent legal authority.  [Citation.]  If either is not provided, the appellate court may treat the issue as waived."].)

14

point in *People v. Martinez* (1999) 20 Cal.4th 225, 235 (*Martinez*) [factors other than distance are relevant to determining asportation].) But even if the victim's initial cooperation is obtained without force or fear, a kidnapping occurs if the accused subsequently compels the victim to accompany him further. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1017 [where victim voluntarily accepted ride with the defendant, that voluntariness was vitiated when the defendant would not let the victim out of the car].) An implicit but false threat of arrest satisfies the force or fear element of kidnapping. (*People v. Majors* (2004) 33 Cal.4th 321, 328-329 (*Majors*).)

"Every person who attempts to commit any crime, but fails, or is prevented or intercepted in the perpetration thereof, . . . is punishable . . . ." (§ 664.) "An attempt to commit a crime consists of (1) the specific intent to commit the crime, and (2) a direct but ineffectual act done toward its commission. [Citations.]" (*People v. Cole* (1985) 165 Cal.App.3d 41, 47-48 (*Cole*).) Thus, the elements of attempted kidnapping are (1) the specific intent forcibly or by fear to move the victim and (2) a direct but ineffectual act done toward moving the victim by force or fear.

An attempt to commit a crime does not require that an element of the underlying offense be committed. (*People v. Medina* (2007) 41 Cal.4th 685, 694.) In particular, asportation is not an element of attempted kidnapping. (*Cole, supra*, 165 Cal.App.4th at p. 50.) " ' " 'Applying criminal culpability to acts directly moving toward commission of crime . . . is an obvious safeguard to society because it makes it unnecessary for police to wait before intervening until the actor has done the substantive evil sought to be prevented. It allows such criminal conduct to be stopped or intercepted when it becomes clear what the actor's intention is and when the acts done show that the perpetrator is actually putting his plan into action.' [Citations.]" [Citation.]' [Citations.]" (*People v. Crabtree* (2009) 169 Cal.App.4th 1293, 1323 (*Crabtree*), italics omitted.) In *Crabtree,* evidence showed that the defendant had Viagra, condoms, a bikini, and bubble bath in the trunk of his car when he went to meet the potential victim with whom he had sexually charged on-line chats. The court found this evidence sufficient to support the conviction for attempt to commit a lewd act upon a child. (*Ibid*.) However, "[m]ere preparation to

15

commit a crime does not constitute an attempt to commit it. [Citation.] There must be some appreciable fragment of the crime committed, and it must be in such progress that it will be consummated unless interrupted by extraneous circumstances. [Citations.] . . . [T]he requirement of 'an appreciable fragment of the crime' [is] simply a restatement of the requirement of an overt act directed towards immediate consummation. . . . 'If it is not clear from a suspect's acts what he intends to do, an observer cannot reasonably conclude that a crime will be committed; but when the acts are such that any rational person would believe a crime is about to be consummated absent an intervening force, the attempt is under way . . . .' [Citation.]" (*Cole, supra*, at p. 49.)

On the issue of the sufficiency of the evidence of the "direct but ineffectual act" requirement for attempted kidnapping, four cases are instructive although each involves arguably stronger facts than the present case: (1) *Martinez, supra,* 20 Cal.4th 225; (2) *Cole, supra*, 165 Cal.App.3d 41; (3) *People v. Fields* (1976) 56 Cal.App.3d 954 (*Fields*); and (4) *People v. Loignon* (1958) 160 Cal.App.2d 412.) In *Loignon, supra*, the oldest of the four cases, the court found the defendant's act of opening the car door and pulling the victim into the car against his will, and then starting the motor, was sufficient to sustain a conviction for attempted kidnapping. (*Loignon,* at p.421.)

In *Fields, supra*, the defendant stopped his car to ask directions of a 13-year-old girl walking alone. As she was responding, the defendant grabbed her by the hair and told her to get into her car. When the victim threatened to scream, the defendant let her go. The *Fields* court found these acts sufficient to establish the requisite intent and affirmative act required to constitute attempted kidnapping. The *Fields* court explained that, "in an unsuccessful kidnapping which has been aborted, to require the prosecution to show more than a forcible attempt to move the victim into a motor vehicle in order to prove intent to move the victim a substantial distance, would be to read the crime of attempted kidnapping out of the law." (*Fields*, *supra*, 56 Cal.App.3d at p. 956.)

In *Cole, supra*, the defendant entered the house through a window, entered the victim's bedroom, covered her mouth with his hand, put a knife to her neck and commanded her to remain silent. He then forced her downstairs at knifepoint, walked her

16

through the dining room and kitchen directly to the front door, but left when he heard the victim's mother's footsteps upstairs. The court found this evidence sufficient to support the attempted kidnapping conviction. (*Cole, supra,* 165 Cal.App.3d at p. 50.)

Most recently, in *Martinez, supra,* our Supreme Court reduced a kidnapping conviction to the lesser included offense of attempted kidnapping finding the following evidence was sufficient to establish the lesser crime: "When defendant grabbed Janet, he demanded she take him to Ramona . . . . He then took her outside and across the backyard . . . . When the police arrived, defendant and Janet were at the rear of the property moving in the direction of the parking area and an adjacent open field. This evidence shows that, but for the prompt response of the police, the movement would have exceeded the minimum asportation distance . . . ." (*Martinez, supra,* 20 Cal.4th at p. 241.)

      3.    <u>Analysis</u>

Here, as to each of the three incidents, there is substantial evidence of both intent to kidnap and that defendant committed an "overt act directed toward immediate consummation" of a kidnapping. (*Cole, supra*, 165 Cal.App.3d at p. 49.)

      **a. Intent**

Specific intent is most often inferred from circumstantial evidence. (*People v. Beeman* (1984) 35 Cal.3d 547, 558-559.) Evidence the defendant committed a crime or other specific instances of misconduct is admissible to prove intent, preparation or plan, among other things. (Evid. Code, § 1101, subd. (b).) Here, defendant's intent to kidnap Carolina on three occasions, and Barbara on one occasion, can be inferred from the evidence that defendant successfully kidnapped two young women in 1987 by luring them into his car, as well as the evidence that in 2000 he attempted to lure another young woman into his car. Defendant's modus operandi in the prior incidents was similar to his modus operandi in the charged attempted kidnappings: in each case, he approached young women who were walking alone on the street, or sitting alone at bus stops, and urged them to get into his car. Defendant's similar intent can be inferred from the

17

similarity of his conduct. That Carolina and Barbara were together on occasion, and that Carolina was with Ball on another occasion, is a distinction without a difference. His prior criminal conduct and the manner he encountered the victims here sufficiently proved his intent.

### b. Overt Act

The evidence that defendant committed an "appreciable fragment" of the crime of kidnapping in the incident involving Barbara and Carolina (counts 2 and 5, respectively) is that he followed his established pattern of driving past his intended victims, made a U-turn to pull up beside them, flashed a badge, stated he was a police officer and ordered them into the car. His ruse was he was make them believe he was going to arrest them for not being in school. Had they complied, this would have been sufficient to satisfy the force or fear element of kidnapping. Considered in light of the common scheme or plan evidence, any rational person observing these events would believe that these were the first steps by a person trying to force Carolina and Barbara into his car. (*Majors, supra*, 33 Cal.4th at p. 331.) Thus, a kidnapping was "about to be consummated absent an intervening force . . . ." (*Cole, supra*, 165 Cal.App.3d at p. 49.)

The first incident involving Carolina alone at the bus stop (count 1) and the third incident involving Carolina passing out fliers with a co-worker (count 6) are closer cases, but we are nevertheless convinced that there was substantial evidence of an overt act in both incidents. On both occasions, defendant followed his usual pattern of driving past the intended victim, making a U-turn and pulling up alongside her, and making an effort to get her into his car. Regarding count 1, defendant's act of beckoning Carolina over to his car was sufficient to establish that he committed an "appreciable fragment" of the crime of kidnapping because, absent an intervening force – in this case, Carolina's rejection of his advances – any rational observer knowing defendant's history would believe that if Carolina voluntarily entered defendant's car, defendant would have driven away and not let her go, in which case a kidnapping would have occurred. (*Crabtree, supra*, 169 Cal.App.4th at p. 1323; *Cole, supra*, 165 Cal.App.3d at p. 49.) Regarding count 6, defendant's act of waiting in front of the donut shop where Carolina had gone to

18

seek refuge was sufficient to establish that he committed an "appreciable fragment" of the crime of kidnapping because any rational observer, knowing defendant's history, would believe that defendant was going to try to get Carolina into his car and, if he succeeded, would drive away with her and not let her out. (*Crabtree,* at p. 1323; *Cole,* at p. 49.) Although the acts here were not as egregious as those in the other cases we have cited, each act, standing alone and in conjunction with each other, leaves no doubt that defendant had taken the necessary overt acts to satisfy that element of attempted kidnapping.

## C.     *Denial of Defendant's New Trial Motion Was Not Error*

Defendant contends the trial court erred in denying his new trial motion. (§ 1181, subd. (6).) He argues that the motion should have been granted because there was insufficient evidence to support his convictions for attempted kidnapping.[8]

As we have already discussed, substantial evidence supported the attempted kidnapping convictions. We find no abuse of discretion in the trial court's denial of defendant's new trial motion.

## D.     *Other Waived Contentions*

Defendant contends it was prejudicial error to admit Smey's testimony that he believed Carolina was telling the truth when he interviewed her at the police station on February 3, 2011, and then to allow the prosecutor to comment on that testimony in closing argument. But a verdict may not be set aside based on the erroneous admission of evidence unless there was a timely objection to the challenged evidence. (Evid. Code, § 353.) Here, defense counsel made no such objection to Smey's testimony. Nor did defendant object to the prosecutor's comments about Smey's testimony. Accordingly,

---

[8]     Defendant also asserts a new trial should have been granted on the impersonating an officer charge. Because he does not support the contention with argument or authority, we deem it waived. (*Kaufman v. Goldman, supra*, 195 Cal.App.4th at p. 743.)

19

defendant has forfeited any appellate challenge to the evidence as well as to the prosecutor's comments on it.  (*People v. Turner* (2004) 34 Cal.4th 406, 426.)

Defendant contends the prosecutor committed misconduct during closing argument by appealing to the passion and sympathy of the jurors.  Defendant's failure to object to the prosecutor's comments constitutes a forfeiture of the issue on appeal. (*People v. Turner, supra,* 34 Cal.4th at p. 426.)

Defendant's contention that the case should be dismissed because there is no evidence in the record that defendant was re-arraigned after his first trial ended in a mistrial is not supported by any argument or legal authority.  Accordingly, we deem it waived.  (*Kaufman v. Goldman, supra*, 195 Cal.App.4th at p. 743.)  For the same reason, we deem waived defendant's contention that the entire case should dismissed pursuant to section 1385.  (*Ibid*.)

## DISPOSITION

We direct the trial court to correct its minute order and abstract of judgment to reflect that sentence on count 4 is concurrent, and to send a copy of the amended abstract to the Department of Corrections.  The judgment is affirmed as modified.


RUBIN, ACTING P. J.

WE CONCUR:


FLIER, J.


GRIMES, J.


20